HAYDEN'S SPORT CENTER, INC., Plaintiff-Appellant, *v.* EDWIN JOHN-SON *et al.*, Defendants-Appellees.

Second District   No. 82—544

Opinion filed November 1, 1982.

Sam Alschuler and Paul A. Lewis, both of Alschuler, Putnam, McWethy, Funkey & Grometer, of Aurora, for appellant.

Stephen M. Cooper, of Geneva, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Hayden's Sport Center, Inc., appeals from an interlocutory order of the circuit court of Kane County denying its motion for a preliminary injunction. Plaintiff's motion, filed with its complaint, seeks to enjoin defendants Edwin Johnson and Joseph S. Calcione from engaging in the sporting goods business until the court rules on the merits of the suit. Plaintiff alleges in its complaint that Johnson and Calcione breached the restrictive covenants in their employment contracts and their duties as agents not to disclose to third persons confidential matters when they resigned their positions as plaintiff's salesmen and began to work for a competitor, Pro-Quip, Inc. After a hearing on plaintiff's motion, the trial court denied the motion from which the plaintiff appeals.

Plaintiff sells sporting goods at retail and at wholesale to schools. Johnson began working for plaintiff in the fall of 1974, and Calcione began in September 1975. As plaintiff's salesmen, they worked out of a Rockford office concentrating on sales of sporting goods to schools. They resigned their positions within a month of each other and began to work for defendant Pro-Quip, Inc., around March or April of 1982. They presently engage in the same work in the same geographical area as when they worked for plaintiff.

Johnson and Calcione had signed identical employment contracts with plaintiff containing a covenant not to engage in the sporting goods business in the area of Illinois north of Interstate Route 74 for two years upon termination of their employment. The covenant further prohibited them from disclosing information obtained while employees of plaintiff. Calcione testified that he signed his employment contract a year after he began working for plaintiff and after he had received a $1,000 salary increase. At the time he received his salary increase there had been no discussion concerning a written contract and he received no extra money or benefits after signing the contract.

Johnson testified that he signed his employment contract without any objections, believing that if he had refused to sign it, his employment would have been terminated. Plaintiff's president, Ron Kruse, testified that Johnson signed the contract in May 1976 and had received his salary increase in March of 1976.

Calcione testified that plaintiff had not been doing any business in the area immediately north of Interstate Route 74 prior to the execution of his employment contract but that he later opened an office in that area. Plaintiff's president testified that plaintiff had been doing business with schools in the Champaign area and the southern counties prior to 1976. He testified that presently plaintiff has offices in

Rockford and Champaign, Illinois, and has two salesmen working out of their homes in Arlington Heights and Morton, Illinois.

Defendants Calcione and Johnson, as well as their secretary, each received copies of plaintiff's "red book" while employees of plaintiff. They were the sole employees in the Rockford office. Although the secretary had a copy of the red book, she had never signed a written employment contract with plaintiff.

The red book contains a description of the products carried by plaintiff, their selling prices for schools, and plaintiff's actual cost for each item. The red book is a compilation of suppliers' catalogs and price lists for the product lines sold by plaintiff. The individual suppliers' catalogs and price lists are available to any wholesaler or retailer who wants to sell that product line. Once a wholesaler determines which product line to sell, a red book type of compilation can be assembled in around five hours. The plaintiff's cost was listed under a letter code rather than outright, so that a purchaser perusing the red book would not see plaintiff's cost. The actual cost of an item depends upon the quantity purchased from the supplier or manufacturer. All wholesalers are charged the same unit price for the volume purchased, and those prices are set forth in the supplier's price list. The volume purchased by individual wholesaler or retailer, however, is not readily available to the general public or competitors.

The red book also contains information concerning plaintiff's "private label" goods. Private label goods are manufactured by a supplier who uses plaintiff's own labels. It allows plaintiff to be more competitive. When ordering items, schools usually specify items by brand names. Defendants knew the manufacturers of plaintiff's private label products, but it would be difficult, although not impossible, for the public to find out the manufacturer of a private label good. An experienced sporting goods salesperson could discern the manufacturer of a private label good by examining it.

The red book serves as a useful and convenient sales item. It allows salesmen to have all the needed information in one book without having to carry each supplier's catalog on a sales call and allows the salesperson to determine plaintiff's cost in quoting a price to a purchaser. Plaintiff's sales people have discretion in setting prices and their determination is based on the unit cost found in the red book.

Price is a determining factor in making a sale. School districts look to price and quality in making a purchase, and salesmen attempt to sell at the lowest price needed to make a sale. A salesperson may be able to underbid another salesperson if he knows at what price the other salesperson is able to sell an item.

Prices for sporting goods change rapidly and Calcione testified that the information contained in the red book would be outdated after 30 to 45 days. The "Illinois school system" publishes a list of comparable items in given bids which is available to school coaches and salespeople. Furthermore, manufacturers publish lists comparing the standards for different lines of sporting goods.

Calcione testified that he did not take the red book with him when he resigned, that the last time he saw it was on the day he resigned, and that he did not copy it. Johnson admitted that he took a red book with him when he left and kept it for around three weeks. Plaintiff's president testified that when Johnson returned the red book, Johnson stated, "I won't be needing it any more, I know it by memory anyway." Calcione further testified that the red book would not be useful while working for Pro-Quip, Inc., because they sell different product lines. There was, however, contradictory testimony concerning the extent of the differences between the product lines sold by Pro-Quip, Inc., and plaintiff.

In addition to the red book, plaintiff maintains "dead files" which contain old orders of clothing or items of a special order nature. These files were kept to resolve billing problems, record what items had been sold service customers, and simplify the reordering of the same item. While an employee of plaintiff, Calcione used old records to determine what a school had purchased in previous years in order to improve his salesmanship. Both Calcione and Johnson testified that they did not take any dead files with them when they resigned. They testified that the information found in the dead files would not be useful to them because Pro-Quip, Inc., sold different product lines. Salespeople could examine and Calcione did, in fact, examine school districts' invoices to determine what items the school purchased in previous years.

Plaintiff also keeps a card system, started in 1959, containing customer names and contact persons. Computer printout sheets also exist which contain similar information. Defendants did not take any of these items when they resigned. Calcione testified that he did not know plaintiff maintained a customer list; Johnson testified that he knew every customer by memory.

Robert Hawkins, president of Pro-Quip, Inc., testified that he did not have a list of customers before he hired Johnson and Calcione but now he has a list: "what they brought." Pro-Quip, Inc., had zero percent of the market before it hired Johnson and Calcione. Plaintiff dominated the northern section of Illinois although it had around ten competitors. School districts who purchased from plaintiff were not

plaintiff's exclusive customers.

Calcione testified that since beginning work for Pro-Quip, Inc., he uses an Illinois Coaches' Directory which lists all the schools and athletic directors. He has contacted those schools in the directory which he had dealt with while working for the plaintiff and has used contacts he made while working for the plaintiff. He further testified that he has obtained names of potential customers from telephone directories. Now, he deals mostly with the same people he dealt with when the plaintiff's employee. Johnson testified that the names of potential purchasers are generally available to those in the sporting goods business. Plaintiff's president testified that although it is no secret who its customers are, it takes a maximum amount of time to find out who purchases sporting goods for a school, the director or an individual coach. According to him, it takes around two or three telephone calls to determine the proper person to contact. Johnson testified that the total time involved in making such an inquiry is 10 to 30 minutes.

The trial court granted defendants' motion for a directed verdict on the issue of the enforceability of the restrictive covenant after plaintiff rested its case. The court found that the covenant failed because it lacked consideration, but the unfair competition counts were still alive and required defendants to proceed. After the defendants rested, the trial court denied the plaintiff's motion for a preliminary injunction, finding that there was an insufficient likelihood of plaintiff's success on the merits to warrant an injunction in that (1) the customer lists were readily available and not hard to discern and (2) the red book, while a helpful price gauge, is not a trade secret because prices change quickly.

The first issue presented is whether the trial court erred in denying plaintiff's motion for a preliminary injunction.

A party seeking a preliminary injunction needs to show that (1) there is no adequate remedy at law and there will be irreparable injury if the injunction is not granted; (2) the threatened injury to him will be immediate, certain, and great if the injunction is denied while the loss or inconvenience to the defendant is comparatively small and insignificant if granted; (3) there is a reasonable likelihood of prevailing on the merits of the case; and (4) there would be no injurious effect upon the general public. (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 502; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 398; *McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 417.) The trial court is vested with a large measure of discretion in the grant or refusal to

grant a preliminary injunction and its determination will not be overturned on review absent a showing of the abuse of that discretion. (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 502; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 398.) A preliminary injunction is an extraordinary remedy and should be granted with the utmost care. *Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 505; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 398.

The sole role of an appellate court in addressing the grant or refusal to grant of an interlocutory decree is restricted to a determination of whether the trial judge correctly exercised his broad discretionary powers. (*Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 690.) Thus, a court of review looks to the sufficiency of the evidence not to determine controverted rights or to decide the merits of the case, but only for the limited purpose of ascertaining whether the trial court abused its discretion. *Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 500; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 135.

To show a likelihood of success on the merits, a party is not required to make out a case which in all events will warrant relief in the final hearing. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 500.) The party need not establish its probable success on the merits because it only seeks to maintain the status quo until the ultimate issue is decided. A preliminary injunction may issue even where serious doubt exists as to the ultimate success of the complaint. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 501.) All that is necessary is that the petitioning party raise a fair question as to the existence of a right claimed, lead the court to believe that he probably will be entitled to the relief prayed for if the proof should sustain his allegations, and make it appear advisable that the position of the parties should stay as it is until the court has had an opportunity to consider the case on the merits. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 500; *Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 508; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 399-400; *Wessel Co. v. Busa* (1975), 28 Ill. App. 3d 686, 690.) A preliminary injunction only serves to maintain the status quo—that is, the last, actual, peaceable and uncontested status which proceeded the pending controversy. *Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 502; *Office Electronics, Inc. v. Grafic Forms, Inc.* (1978), 56 Ill. App. 3d 395, 398.

Plaintiff argues that the sole disputed issue is whether the trial court erred in finding that plaintiff failed to raise a fair question as to

the existence of the right claimed, *i.e.,* plaintiff's proprietary interest in his confidential information concerning his customers and sales tools. Defendants argue that plaintiff's customer information and red book are not trade secrets and thus not a protectable business interest.

■■ Regardless of the theory behind plaintiff's cause of action, tort or contract, the pivotal question is whether plaintiff has a protectable business interest. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 355.) Thus, even though Johnson and Calcione may have breached the restrictive covenants in their employment contracts, plaintiff nevertheless must show injury to its legitimate business interest separate and distinct from defendants' breach of the restrictive covenant in order to secure its enforcement through injunctive relief; otherwise, such a covenant is deemed an unenforceable attempt to prevent competition *per se. Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 765.

■■ A protectable business interest will be found where a trade secret or a near-permanent customer relationship exists which an employee learned of only through his employment and either a "reasonable" restrictive covenant agreement has been executed or a breach of confidentiality has occurred. (*Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 356; *Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 765.) Illinois courts describe a trade secret as a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide in. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92; *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 385, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225.) It must relate to something held in secret or confidence and concern the operation of a particular trade or business. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92.) Information will not be considered a trade secret if its contents are generally known within an industry, fully and completely disclosed by the company through its catalogs or literature disseminated throughout the industry, or disclosed by the products themselves. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93.

In *ILG Industries,* the court explained that although there is no exact definition of a trade secret, the Restatement of Torts sets forth factors in determining the existence of a trade secret:

" "(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures

taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' " (49 Ill. 2d 88, 93, citing Restatement of Torts sec. 757, comment *b*, at 6 (1939).)

Furthermore, whether certain information is a trade secret requires the balancing of competing concerns: protection of a business investment of time, money and manpower against the wrongful appropriation of confidential information by prior employee and an individual's right to follow and pursue a particular occupation in which he is best trained. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93-94.

No business has a proprietary interest in customers, although it may have such an interest in lists of customers which it maintains. (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 766; *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710, 714-15.) Such a list, even if copied by an employee, may still not be a protectable interest. (*Heatbath Corp. v. Ifkovits* (1969), 117 Ill. App. 2d 158, 166-67.) In *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 357-58, the court found that customer lists may be considered a trade secret under proper circumstances and protected as such. The court stated that:

"After reviewing the decisions in this area, we find that Illinois courts have held that a customer list or other customer information constitutes a trade secret in which an employer holds a protectable interest where the list has been developed by the employer over a number of years [citations], the employer developed the list at great expense [citations], and the information was kept under lock and key. [Citations.] However, the same type of information has not been held to be a trade secret where it has not been treated as confidential and secret by the employer [citations], was generally available to other employees [citations], the information was known to those in the field or could be easily duplicated by reference to telephone directories, or professional publications [citations], and where customers did business with more than one company or otherwise changed businesses frequently so that they were known to an employer's competition. [Citations.]" 99 Ill. App. 3d 353, 358.

The manifest weight of the evidence adduced at the hearing on plaintiff's motion does not contradict the trial court's finding that the customer information (card system and computer printout sheet),

the dead files, and the red book are not protectable business interests. The information concerning plaintiff's customers is readily ascertainable from the Illinois Coaches' Directory and telephone directories. The proper person to contact is easily discovered by telephone calls. The information kept in the dead files is useless to Johnson and Calcione because they sell different product lines (although there is some dispute as to this), and otherwise available by inspecting past invoices of plaintiff's customers. Although plaintiff contends that its specific lists (the card system and computer printout) were not available to the general public or plaintiff's competitors, the relevant inquiry is the availability of the information, not the actual lists. (See *Image Supplies, Inc. v. Hilmert* (1979), 71 Ill. App. 3d 710; *McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415.) Determining plaintiff's customers could be accomplished without resorting to extraordinary methods. (See *Midwest Micro Media, Inc. v. Machotka* (1979), 76 Ill. App. 3d 698; *TAD, Inc. v. Siebert* (1978), 63 Ill. App. 3d 1001; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132.) Furthermore, the customers contacted by Johnson and Calcione were based upon their memories. See *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill. App. 3d 158 (no injunction warranted where salesman relied on his memory in contacting customers of his former employer and pricing information available from customers themselves).

Similarly, the red book contains information that is readily available to any wholesaler who wants to sell a manufacturer's product line. It represents a mere compilation of manufacturers' catalogs and price lists. The only exception concerns "private label" products. However, an experienced salesman could determine the manufacturer of the private label item and thus defeat any of plaintiff's competitive advantage. The only information which defendants Johnson and Calcione have which is not available to the general public or others in the sporting goods industry is the volume of items purchased by plaintiff from an individual manufacturer. This information determines plaintiff's actual cost in procuring these items. By knowing plaintiff's costs, Johnson and Calcione could have the opportunity of underbidding plaintiff. However, the trial court found and the evidence reveals that since prices change rapidly, the information in the red book would be outdated after 30 to 45 days. This rapid change of prices defeats the usefulness of knowing the information in the red book.

Related to the inquiry concerning the extent to which the information is known outside of the particular plaintiff's business is the value of the information. Since the information contained in the pur-

ported trade secrets in the present case is readily ascertainable by plaintiff's competitors, the value of the information is insignificant. In *Heatbath Corp. v. Ifkovits* (1969), 117 Ill. App. 2d 158, 166-67, this court stated:

> "It is evident that Ifkovits copied the names of the customers from Heatbath rather than going to lists which were legally obtainable for the information. However, it cannot be said that Heatbath was damaged thereby because the names of the customers were publicly available to anyone with no delay or effort involved and that, therefore, there was no advantage gained by copying them."

The evidence fails to reveal attempts made by plaintiff to keep the information confidential. The red book had been distributed to all plaintiff's employees in the Rockford office. This distribution included a secretary who had not signed an employment contract with a restrictive covenant. (See *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353.) The purported trade secrets were not kept under lock and key. (See *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132.) Thus, although plaintiff did code the actual costs of his products found in the red book, the code itself was known to all levels of employees. (See *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225; *McCann Construction Specialties Co. v. Bosman* (1977), 44 Ill. App. 3d 1020.) Furthermore, even if plaintiff showed the existence of certain safeguards, that alone would not establish the confidentiality or secrecy of the information. *Packard Instrument Co. v. Reich* (1980), 89 Ill. App. 3d 908, 917.

■ Finally, plaintiff contends that Johnson and Calcione's knowledge of plaintiff's customers' buying habits obtained while employees of plaintiff constitutes a trade secret. This information consists of past purchases of these customers. In *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, the court held that an employee's prior knowledge of the needs of prospective customers, the type of products which would satisfy those needs, and the proper allocation of the products were protectable business interests. However, the employer's business dealt with technological data concerning lubricants. The knowledge acquired concerning each customer was unique and acquired only through experimentation and tests. In the present case, the knowledge plaintiff claims to be a trade secret is more generalized and more easily ascertainable. See *Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498 (needs of customers not known publicly constitute trade secrets).

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

SEIDENFELD, P.J., and LINDBERG, J., concur.