**SYNTEX OPHTHALMICS, INC. and Arapahoe Chemicals, Inc., Plaintiffs-Appellees,**

v.

**George F. TSUETAKI, Fused Kontacts of Chicago, Inc. and Nick N. Novicky, Defendants-Appellants.**

Nos. 82–1837, 82–2019, 82–2581 and 82–2582.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 10, 1982.

Decided March 2, 1983.

---

Gerald S. Geren, Epton, Millin, Segal & Druth, Ltd., Keith V. Rockey, McDougall, Hersh & Scott, Chicago, Ill., for defendants-appellants.

James Gould, Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiffs-appellees.

Before WOOD and ESCHBACH, Circuit Judges, and BARTELS,* Senior District Judge.

BARTELS, Senior District Judge.

In consolidated appeals Nick N. Novicky, George F. Tsuetaki and Fused Kontacts of Chicago, Inc. appeal from a preliminary injunction issued on May 26, 1982, by the United States District Court for the Northern District of Illinois restraining use of certain trade secrets and from a subsequent order, issued on September 8, 1982, interpreting and delineating the scope of the preliminary injunction.

### Prior Proceedings

This action was brought by Syntex Ophthalmics, Inc. and Arapahoe Chemicals, Inc. (collectively referred to as "Syntex")

---

* The Honorable John R. Bartels, Senior District Judge of the Eastern District of New York, is sitting by designation.

against Novicky, a former employee, and George F. Tsuetaki and Fused Kontacts of Chicago, Inc. (collectively referred to as "Tsuetaki"), Novicky's subsequent employer, for misappropriation of trade secrets and patent infringement. The complaint alleged that Syntex was entitled to certain patents owned by Novicky and Tsuetaki and sought injunctive and monetary relief for patent infringement and misappropriation of trade secrets. Initially, after hearing some live testimony, the court denied two motions by Syntex for a preliminary injunction because Syntex at the time had not met its substantial burden of proving that it was entitled to such relief. Extensive pretrial discovery ensued. The record grew to include over 1,000 pages of deposition testimony and exhibits supporting Syntex's claim of misappropriation of its trade secrets, and over 1,000 pages of memoranda, deposition testimony and exhibits submitted by Tsuetaki and Novicky. In addition it included a state court transcript of a 16-day bench trial in which Tsuetaki had sued Novicky and in which the Illinois state court had decided that Tsuetaki was entitled to trade secret protection from Novicky for much of the same information that is at issue in the present case. After reviewing the voluminous record, the district court concluded that Syntex was reasonably likely to succeed on the merits; its remedy at law was inadequate; it would experience irreparable injury without injunctive relief which outweighed the threatened harm such an injunction might cause Tsuetaki and Novicky; and the injunction would not disserve the public interest. Therefore, it granted Syntex the preliminary injunction.

The preliminary injunction order enjoined defendants from using certain silicone monomers (chemical compounds) used in the formulation of rigid gas permeable contact lenses ("silicon-PMAA contact lenses") and certain process steps contained in the so-called "Arapahoe process sheets." Recognizing that certain information incorporated in those process sheets could be obtained from publicly held information, the court specified in the order that defendants would be entitled, with leave of court, to use any information "described but not claimed in any patent or publication," since such information was not subject to trade secret protection.[1]

On June 3, 1982, Tsuetaki and Novicky made an emergency motion for stay of the preliminary injunction order pending appeal, and on June 17, 1982, this court denied that motion. Subsequently, in accordance with the preliminary injunction, Novicky and Tsuetaki filed motions with the trial court for leave to use information they claimed was not barred by the injunction. Each of the motions presented a list of process steps which that particular defendant sought leave to use in the preparation of silicone-PMAA contact lenses, and both appellants also sought leave to use a chemical compound claimed in Dow's Quaal U.S. Patent No. 3,377,371. In addition, Tsuetaki sought leave to use one purportedly "novel" compound—the "Tsuetaki proposed monomer"—and Novicky requested leave to use two "novel" chemical compounds—"silicone A" and "silicone B" and the resulting monomeric chemical structures designated as "I" and "II." To aid it in the resolution of these motions, the court appointed a patent

1. The order in pertinent part reads as follows:

[Defendants] are hereby enjoined, pending a trial on the merits of this controversy or further order of court, from using or disclosing or causing or inducing others to use or disclose the procedure for manufacturing silicone monomers or casting copolymer rods using silicone monomers, as set forth in Appendix B to Plaintiff's Memorandum in Support of Renewed Motion for Preliminary Injunction, for the fabrication of gas permeable contact lenses. The above restriction shall not be construed to enjoin the defendants from using any Safety Information which is included in Appendix B at pages 2–3 of Exhibits 190 and 191, which are a part thereof. With leave of court, the defendants will also be entitled to use any information described but not claimed in any patent or publication, including but not limited to the Gaylord patents 3,808,178 and 4,120,570. Where the defendants seek to use such information, they are instructed to furnish the plaintiff and the court with a short plain statement of the information they seek to use and also the column and line reference of the applicable U.S. patent or page of the publication.

lawyer, Warren D. McPhee, as its own expert. McPhee filed his report with the court on August 5, 1982, and on August 18 and 19, 1982 was examined in open court by all parties. The parties submitted written comments on McPhee's report and testimony but were not allowed to present testimony of their own experts.

On September 8, 1982, the district court issued its opinion, adopting McPhee's report, and granting in part and denying in part defendants' motions. Specifically, the court granted both defendants leave to use the process steps specified in their motions and the compounds described in the Quaal patent. It concluded, however, that the three "novel" compounds, while not identical to the monomers proscribed by the preliminary injunction, represented "a continued benefit from the misappropriation of Syntex's trade secrets." Applying the doctrine of equivalents, the court denied defendants the use of these "novel" monomers.

Although the court's September opinion and the proceedings leading up to its issuance occurred after appeal from the preliminary injunction order, they are included in this record, pursuant to Fed.R.App.P. 10(e) and Circuit Rule 4, since they were before the trial court in a proceeding interpreting that order.

### Background

For a thorough analysis of the factors necessary to support the preliminary injunction, a detailed background is appropriate. In 1977 Syntex bought two patents, U.S. Patent No. 3,808,178 and U.S. Patent No. 4,120,570, designated as the "Gaylord patents," which formed the basis for a research project, named the "Polycon project," the purpose of which was to develop a contact lens material from which rigid (or "hard") gas permeable contact lenses could be made. Up until that time hard contact lenses were made from a plastic material called polymethyl methacrylate ("PMMA") that did not allow the transmission of oxygen to the wearer's cornea. Because of the lenses' lack of oxygen permeability, the user could not wear them for extended periods, and sometimes the wearer developed a condition known as corneal edema. It was believed that a gas permeable lens would allow the user extended lens wear and would lower the incidence of corneal edema.

Contact lenses are made by reacting certain chemical compounds ("monomers") into plastics ("copolymers") by a process called "polymerization." The lens material is then formed into rods, which are subsequently sliced into discs ("buttons") which are then ground into the lenses themselves. The purpose of the Polycon project was commercial development of specific monomers which, when polymerized with PMMA and other compounds, would yield an oxygen permeable lens material. Applying the information embodied in the Gaylord patents, Syntex estimates that it spent more than an additional one million dollars and twenty man-years of time to develop and obtain Federal Drug Administration ("FDA") approval for its commercially feasible oxygen permeable polycon lens material ("Polycon").

Novicky, a chemist employed by Syntex since 1973, was assigned to the Polycon project in May, 1977, and he worked in the project until he quit his employment at Syntex on May 12, 1978. Throughout Novicky's tenure at Syntex, the terms of his employment were governed by a written agreement in which he agreed to disclose and assign all ideas and inventions he developed to Syntex and to keep all Syntex's ideas and developments confidential. On December 15, 1977, Novicky prepared a patent disclosure statement concerning certain silicone monomers he had developed, which he claimed produced a material five to ten times more permeable than the Polycon lens material Syntex was developing. These compounds, and the processes Novicky developed for preparing the desired chemical reactions, form the basis for two patents Novicky later obtained in 1980 and 1981, U.S. Patent No. 4,242,483 and U.S. Patent No. 4,248,989.

On May 16, 1978, four days after Novicky terminated his employment at Syntex, he

prepared a second patent disclosure statement revealing the discovery of additional chemical compounds for use in making gas permeable lens material. One of these was later designated the "S–9" monomer and patented under U.S. Patent No. 4,216,303. Novicky claims that the development of his new monomers was independent of his earlier work at Syntex. Syntex contends that the May 16 discovery was actually conceived and developed by Novicky during his employment there.

In August, 1978, Novicky contacted Tsuetaki and subsequently made available to Tsuetaki the formulae and processes contained in the May 16 disclosure, a sample rod Novicky had made using his S–9 monomer, and some of the Arapahoe process sheets Novicky had prepared while he was with Syntex. After reviewing this material, Tsuetaki agreed to purchase Novicky's new technology for $20,000 and to hire Novicky as a chemist whose job would be developing commercially marketable gas permeable contact lenses. Among other services for his new employer, Novicky prepared process sheets describing the processes for formulating his chemical compounds, which the district court found were copied almost verbatim from approximately 100 pages of the Arapahoe process sheets Novicky had appropriated from Syntex.

In May, 1982, Novicky resigned from Tsuetaki, and two months later Tsuetaki sued him in Cook County Circuit Court for breach of his employment contract and of an agreement for the assignment of inventions to Tsuetaki. That suit resulted in a judgment on January 13, 1981, in favor of Tsuetaki. Meanwhile, Syntex became aware that Tsuetaki was manufacturing non-FDA approved gas permeable lens material resembling Polycon, and it initiated the instant litigation. As previously mentioned, the district court, after reviewing a voluminous record, concluded that the requirements for a preliminary injunction were met and granted Syntex injunctive relief. Subsequently, it issued an interpretive opinion, granting in part and denying in part defendants' motions for leave to use information they claimed was not barred by the injunction. On appeal defendants contend that the district court erred in the following respects: (a) it issued a preliminary injunction order without an evidentiary hearing or additional time for discovery; (b) it relied on incorrect legal standards in granting an injunction, which is impermissibly vague and indefinite; and (c) the opinion of September 8 impermissibly extends the preliminary injunction and the hearing held in conjunction therewith was critically defective.

*Discussion*

The gravamen of the appellants' claim is that the district court abused its discretion in various respects in issuing the preliminary injunction. Our review of the broad discretion residing in the district court in granting a preliminary injunction is extremely limited, *Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 49 (7th Cir.1980); *Sangmeister v. Woodard*, 565 F.2d 460, 465 (7th Cir.1977), *cert. denied*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978); *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), and accordingly we do not adjudge its issuance on a *de novo* basis.[2] As we have said in *Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d 795, 796–97 (7th Cir.1981), in order to justify the district court's exercise of discretion in issuing the preliminary injunction, the plaintiff must show: "(1) it has at least a reasonable likelihood of success on the merits, (2) it has no adequate remedy at law and will otherwise be irreparably harmed, (3) the threatened injury to it outweighs the threatened harm the preliminary injunction may cause the defendants, and (4) the granting of the preliminary injunction will not disserve the public interest." *See also Helene Curtis Industries, Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir.1977), *cert. denied*,

---

2. As a matter of fact, the trial was originally scheduled for October, 1982, and we assume, upon the issuance of this order, it will be promptly rescheduled.

434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976). Having in mind the above principles, we proceed to the analysis of appellants' challenges to the district court's findings.

## I

Appellants contend, first, that the district court abused its discretion in granting the preliminary injunction inasmuch as it was impossible for it to comply with the above requirements without holding an evidentiary hearing properly to determine the credibility of witnesses on disputed facts. At the threshold, we note that on June 17, 1982, this court denied a motion for stay of the preliminary injunction for lack of a hearing, stating, "there was no abuse of discretion on the part of the district court judge in entering the preliminary injunction without holding an evidentiary hearing." No. 82–1937 (7th Cir. June 17, 1982).[3] Subsequent developments in the case have failed to persuade us to change our original decision of June 17, 1982.

 Of course, it is an established principle that where issues of fact are conflicting, an injunction *pendente lite* normally should not issue without an evidentiary hearing. *Forts v. Ward,* 566 F.2d 849, 851 (2d Cir.1977); *Consolidation Co. v. Disabled Miners of Southern West Virginia,* 442 F.2d 1261, 1269–70 (4th Cir.1971), *cert. denied,* 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971); *General Electric v. American Wholesale,* 235 F.2d 606 (7th Cir.1956); *Sims v. Greene,* 161 F.2d 87 (3d Cir.1947). Under the circumstances of this case, however, an evidentiary hearing was unnecessary because the evidence already in the district court's possession enabled it to conclude that the plaintiff had a reasonable likelihood of success on its claim of trade secret misappropriation. The critical disputed fact as to this claim was the date on which Novicky conceived of the S–9 monomer in his May 16 disclosure. According to Novicky's deposition testimony, he conceived of it when he was reviewing a German article on silicone chemistry four days after he left Syntex. Appellants complain that no direct documentary evidence or testimony contradicts Novicky, and the court, before disbelieving Novicky's deposition testimony, should have held .an evidentiary hearing in order accurately to assess his credibility. Other substantial evidence, however, enabled the district court to conclude that Syntex was reasonably likely to prevail on this claim notwithstanding Novicky's statement. For example, the district court had before it documentary evidence showing that Novicky had wilfully misappropriated the Arapahoe process sheets, a transcript of a trial in which the Illinois state court had held that Tsuetaki was entitled to trade secret protection from Novicky for much of the same information that is at issue here, the inherent improbability of Novicky's story that he conceived of the monomer four days after he left Syntex, and the close structural similarity between the S–9 monomer and the monomers Novicky had developed at Syntex. In this context it was not unreasonable for the district court to conclude, without a hearing, that Syntex was likely to succeed in establishing that Novicky had developed the S–9 monomer while employed at Syntex. Tsuetaki also complains that he was denied additional time to complete discovery before the injunction, but this was not error since several extensions of time had already been granted to Tsuetaki.

## II

 Appellants further allege that the district court made erroneous rulings on critical legal questions in granting the injunction. Their first argument is that the court erred in refusing to consider the fact that Syntex no longer uses the process sheets and never used the chemical compounds developed by Novicky, for under Illinois law, information not used in the plaintiff's business is not entitled to trade secret status. An early Illinois case sup-

---

**3.** This court also concluded that the one million dollar bond was sufficient, which we reaffirm.

ports appellants' argument that a plaintiff must be employing a trade secret before he can maintain a suit for its misappropriation, *Victor Chemical Works v. Iliff,* 299 Ill. 532, 132· N.E. 806 (1921); *see also Ferroline Corp. v. General Aniline & Film Corp.,* 207 F.2d 912, 921 (7th Cir.1953). In further support of its argument, Tsuetaki claims that "actual use" is necessary because Illinois has adopted the description of trade secrets set forth in section 757, comment b of the Restatement, Torts (1930), which states in pertinent part:

> A trade secret may consist of any formula, pattern, device or compilation of information *which is used in one's business,* and which gives him an opportunity to obtain an advantage over competitors who do not know or use it ... (emphasis added).

Tsuetaki's interpretation of the above language is questionable, but in any event the Illinois courts do not rely solely on that statement, but rather they refer to the acknowledgment in the Restatement that no exact definition of a trade secret, applicable to all situations, is possible, and they refer to the six factors set forth in the Restatement which are designed as a guide in determining whether information is a trade secret. None of these factors mentions "actual use", and the fourth factor to be considered is whether the purported trade secret is "of value" to the plaintiff's business. *See, e.g., ILG Industries, Inc. v. Scott,* 49 Ill.2d 88, 273 N.E.2d 393 (1971). Actual use is unnecessary. Under current Illinois law the proper criterion is not "actual use" but whether the trade secret is "of value" to the company. *Id.; Hayden's Sport Center, Inc. v. Johnson,* 109 Ill.App.3d 1140, 65 Ill. Dec. 612, 441 N.E.2d 927 (2d Dist.1982); *Lincoln Towers Ins. Agency v. Farrell,* 99 Ill.App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034 (1st Dist.1981); *Bimba Mfg. Co. v. Starz Cylinder Co.,* 119 Ill.App.2d 251, 256 N.E.2d 357 (1st Dist.1969). *See also Harris Mfg. Co. v. Williams,* 157 F.Supp. 779, 787 (W.D.Ark.1957); R. Milgrim, *Trade Secrets,*

§ 2.02[1]. The district court's finding that the compounds and process sheets are of value to Syntex is amply supported by the evidence. Accordingly, since this finding is "not clearly erroneous," *Sangmeister v. Woodard,* 565 F.2d at 464–65, it will not be disturbed by this court.

■ Appellants' second argument is that Novicky's wrongful patent application of Syntex's trade secrets deprives Syntex of its trade secret protection and permits appellants to use those secrets. In support of their argument, they cite *Sears Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), which stand for the proposition that an owner of a trade secret who ˙voluntarily discloses his trade secret makes an election to seek federal patent protection.[4] That situation, though, is not present in the instant case. *See Water Services Inc. v. Tesco Chemicals, Inc.,* 410 F.2d 163, 171 (5th Cir.1969); *Servo Corp. v. General Electric Co.,* 337 F.2d 716 (4th Cir.1964), *cert. denied,* 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); *Schulenburg v. Signatrol, Inc.,* 33 Ill.2d 379, 212 N.E.2d 865 (1965), *cert. denied,* 383 U.S. 959, 86 S.Ct. 1225, 16 L.Ed.2d 302 (1966). Here the holder of the trade secret did not make an election to obtain a patent, but instead it was appellants who had misappropriated the trade secrets and secured the patent. In 1936 we held in *Shellmar Products Co. v. Allen-Qually Co.,* 87 F.2d 104 (7th Cir.1936), *cert. denied,* 301 U.S. 695, 57 S.Ct. 923, 81 L.Ed. 1350 (1937), that a wrongdoer who has made an unlawful disclosure of another's trade secrets cannot assert that publication to escape the protection of trade secret law. We believe that principle to be equally vital today. To hold otherwise in the instant case would be to permit appellants to profit from their own wrong.

### III

■ Appellants also argue that the preliminary injunction is vague and indefi-

---

**4.** Syntex had an option to patent the same, and while losing trade secret protection, thus obtain a monopoly, or alternatively it could have retained the advantage of trade secrecy protection.

nite in violation of Federal Rule of Civil Procedure 65(d) in that, as shown by the September proceedings, expert testimony is needed to interpret it, and defendants are required to ask the court's permission to use publicly available information. We disagree. Rule 65(d) is satisfied if the injunction "fairly inform[s] defendants of the restrained acts relating to plaintiff's trade secrets," and its terms need not disclose trade secrets. *Dekar Industries Inc. v. Bisset-Berman Corp.,* 434 F.2d 1304 (9th Cir. 1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971). Moreover, a trade secret can be comprised of both public and novel information. As the Second Circuit noted:

> [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Imperial Chemical Industries, Ltd. v. National Distillers & Chemical Corp.,* 342 F.2d 737, 742 (2d Cir.1965); *see also Sikes v. McGraw-Edison Co.,* 665 F.2d 731 (5th Cir. 1982). The district court's order placed defendants on notice of the restrained acts, and where any possible confusion existed, the court provided an acceptable procedure for interpreting and applying the injunction and for distinguishing between Syntex's trade secrets and information in the public domain. The scheme devised afforded the parties a pragmatic tool for interpreting and applying the injunction, which appellants successfully utilized in September. Accordingly, we must reject appellants' attack on the scope of the injunction.

## IV

■ We come now to the appellants' challenge to the court's supplementary opinion interpreting and applying the original injunction. At the hearing in August, the court developed a complete record by permitting extensive cross-examination of the court expert, written communications and objections of all parties to the expert witness' report and the submission of motions and supporting and opposing briefs by all parties. Appellants claim that McPhee was unqualified and further, that the court committed error in refusing to permit the testimony of partisan expert witnesses. McPhee, a patent attorney for 30 years, had considerable experience in prosecuting claims involving chemical compounds of the type involved here and was qualified to testify to and determine what is and is not an equivalent, as he did in the case of appellants' "novel" monomers. *See Graver Tank and Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).[5] There is no doubt that he was eminently qualified to render technical assistance to the court. As far as partisan experts are concerned, in light of the complete record, their testimony was unnecessary.

■ Finally, appellants argue that in its supplementary opinion the court erred by failing to approve their use of the three "novel" monomers. Since these chemical compounds were not identified as proscribed in the injunction order, they contend that the court's ruling extends the scope of the original preliminary injunction. In *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856, the Supreme Court articulated the doctrine of equivalents, which grants protection to patented inventions from imitations which perform "substantially the same function in substantially the same way to obtain the same result" as the patented invention. In denying defendants use of their "novel" monomers, the court properly applied the doctrine of equivalents; the court's finding that the compounds in question "were closely related to and functioned the same way to achieve the same result" as proscribed compounds is not clearly erroneous, and therefore cannot be disturbed by this court.

We have considered appellants' other contentions and find them without merit.

---

5. In addition McPhee has a Ph.D. in organic chemistry, has laboratory experience in chemical synthesis, is an inventor and an author of numerous technical publications.

In sum, we find nothing in the record which justifies the conclusion that the district court abused its discretion in granting the injunction. Accordingly, we affirm.