**MEANS SERVICES, INC., a Delaware corporation, Plaintiff,**

v.

**RENTAL UNIFORM SERVICES OF NORMAL–BLOOMINGTON, INC., an Illinois corporation, Phillips Jones, Jerry Kowalczyk, Steve McAvoy and James Singer, Defendants.**

No. 85–2466.

United States District Court, C.D. Illinois.

April 17, 1986.

James Hagle, Zimmerly, Gadau, Selin & Otto, Champaign, Ill., and John P. Scotellaro, John R. Myers, Charles G. Albert, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

Michael W. Ford, James P. O'Brien & David S. Barritt, Chapman & Cutler, Chicago, Ill., Thomas B. Meyer, Acton, Meyer, Smith, Miller & Anderson, Danville, Ill., for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

BAKER, Chief Judge.

The plaintiff, Means Services, Inc. (Means), seeks equitable and compensatory relief against the defendants, Rental Uniform Services of Normal-Bloomington, Inc. (RUS), Phillip Jones, Jerry Kowalczyk, Steve McAvoy, and James Singer. Jurisdiction is based upon diversity of citizenship. The plaintiff Means is a citizen of Delaware with its principal place of business in California. The defendant RUS is a citizen of Illinois with its principal place of business in Illinois. The individual defendants, Jones, Kowalczyk, McAvoy, and Singer, are citizens of Illinois. The matter in controversy exceeds the sum of $10,000 exclusive of interest and costs. *See* 28 U.S.C. § 1332.

Means is a textile rental service company. The individuals, Phillip Jones, Jerry Kowalczyk, Steve McAvoy and James Singer, are former employees of Means who are now employed by the defendant RUS. Means claims that RUS intentionally interfered with contracts between Means and its customers and that Jones, Kowalczyk, McAvoy, and Singer violated covenants not to solicit which were contained in their employment contracts with Means. This case comes before the court on Means' motion for a preliminary injunction against the individual defendants forbidding them to solicit Means' customers in violation of the restrictive covenants in their employment contracts. Means also seeks a preliminary injunction against RUS forbidding future interference with the existing contractual relationships between Means and its customers. The following are findings of the court with respect to the motion for a preliminary injunction; they are without binding effect in any subsequent trial on the merits. *See* Fed.R.Civ.P. 65(a)(2). *See also* Wright & Miller, Federal Practice and Procedure: Civil § 2950 at 494.

### FACTUAL FINDINGS

1. Since 1892, Means has operated a national textile rental system. It provides towels, uniforms, floor mats, bed linens, table linens, dust control items, and, in short, any textile requirement for any customer on a rental basis. The Means distribution network is organized into marketing centers. In the Central District of Illinois, the East Moline marketing center is the control point for the operation of five distribution centers, or branches. Trucks are operated out of the distribution centers by route representatives who have direct contact with Means' customers. The centers

are supervised by a branch manager who controls route managers and route representatives. The five branch managers report to the manager of the marketing center.

2. The standard Means contract for textile rental runs for two years and has an automatic renewal provision which operates unless the contract is cancelled by the customer or by Means. When a customer signs a contract with Means, Means assesses the textile requirements of the customer, purchases the necessary textiles and recovers the cost of the textiles over the life of the contract. On renewal of the contract, the textiles are either replaced or upgraded. In the East Moline and Decatur centers, Means records show that eighty percent of the customers have been customers of Means for more than four years; sixty-eight percent of the customers have been with Means six years or more; fifty-eight percent of the customers have been with Means eight years or more. A significant number of Means customers have been dealing with the company for over thirty years.

3. Means compiles and maintains information about its customers. It maintains financial information, rate scheduling and pricing structures, and replacement rates. It has item cost cards and customer cross-reference lists with dates and schedules for deliveries. Means also prepares branch processing statements which include customer profitability data. Means develops profiles for its customers which reflect customer needs. That profile also includes prices and cost analysis. This customer information, some of which is of a confidential nature, is available to personnel in contact with the customers. Testimony indicated that the information changes continually, however, and is valid for only about thirty days.

4. RUS started competing with Means in the Central Illinois market in the first quarter of 1985. The market for textile rentals is a highly competitive one and price is the main impetus for customers to enter into and terminate their contracts for rental materials.

5. The individual defendants, who currently are employees of RUS, left Means in the first half of 1985 to work for RUS. The defendant Jones had an employee contract with Means that he signed on January 1, 1983, as a sales representative for Means in the Decatur, Illinois, marketing center. The counties served by the marketing center as listed in that contract included nineteen in Illinois and four in Indiana. The defendant Kowalczyk signed a contract with Means on June 14, 1982, as a route representative in the Bloomington-Peoria area of Illinois. The defendant McAvoy signed a contract with Means on January 1, 1983, for the East Moline, Peoria, and Washington, Illinois, area as a route manager. The defendant Singer signed an employee contract with Means on January 1, 1983, as a senior sales representative out of the East Moline Branch which listed twelve counties in Illinois, fourteen counties in Iowa, and one county in Wisconsin, as the counties served by his marketing center. Each of the individual defendants had a long history of employment with Means predating the most recent employment contract signed by each of the individual defendants. Jones' employment went back to October, 1973, McAvoy's to April of 1978, and Kolwalczyk's to 1982. Singer also had a long employment relationship with Means.

6. The employment contracts, in essence, created an "at will" employment relationship between the individual defendants and Means. The pertinent paragraph in each of the employment contracts is the following:

3. The Second Party agrees that he will not at any time during the period of his employment or for a period of two (2) years following the voluntary or involuntary termination of his employment, directly or indirectly, for or on behalf of himself or any person, natural or corporate; solicit, divert, take away or attempt to solicit, divert or take away any customers, business or patronage of the

Company within the territory described above, or in any other territory in which the said Second Party was employed by the Company. This restriction shall apply to the Second Party as an employee, owner, partner, agent, officer, director, stockholder or as a financial interest in any capacity in the textile maintenance rental business. The Second Party agrees not to personally use either as an individual, employee, owner, partner, agent, officer, director or in any other manner whatsoever, directly or indirectly or in combination with others, any of the knowledge or information obtained as a result of employment with the Company for a period of two (2) years after termination of his employment from the Company unless authorized by the Company in writing.

7. The evidence shows that Means did not spend a great deal of time or effort in training its employees. Although Means provided its employees some schooling in customer relations and maintaining quality control, Means accomplished this by occasional sales meetings and by taking employees out on their routes for one or two days at the beginning their work experience to show them the route and introduce them to customers.

8. Customer development was neither costly nor difficult. Means could develop a customer in a very short period of time—usually with one to three brief visits. A representative of Means would visit the customer once or twice, gather information on the customer's needs, and fill out a form contract which, if accepted by the customer, would establish the customer relationship. Continued personal customer contact by an employee was not essential to maintaining customer relationships. The main function of the employee was to deliver the textile products punctually and see that the terms of the contract were met. No evidence suggests that the typical Means customer had a personal relationship with or reliance upon the Means route representative. Means' employees did not gain intimate knowledge about the business operations of the customer. The employee's purpose was to service the contract and to make sure that the terms of the contract were carried out punctually. The employee's ability to meet the textile rental customers was not limited to the opportunity afforded by the employment relationship. The identity of textile rental customers is readily available in the yellow pages of the phone book or through observation by driving or walking through any commercial area.

9. The evidence does not show that any of the individual defendants carried away confidential information when they left Means' employment and went to work for RUS. The individual defendants gave uncontradicted testimony that they carried away no rate schedules or pricing structures or replacement rates belonging to Means. They had no item cost cards or customer cross-reference lists. None of them possessed a branch processing statement or customer profile. Means' counsel agreed in oral argument before the court that no evidence supported the proposition that the individual defendants had carried away confidential documents which belonged to Means. The evidence also is clear that the pricing structures and contract prices charged by Means are readily available from the invoice which is provided to the Means customer. Means customers are able to show those invoices to Means competitors and Means makes no contention that the information contained on the price invoices is confidential or constitutes a trade secret.

## CONCLUSIONS OF LAW

The criteria to be applied in determining the propriety of preliminary injunctive relief are well established in the case law. Means bears the burden of establishing the five elements necessary for the issuance of a preliminary injunction: (1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than

the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest. *See Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1431–32 (7th Cir.1986); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 382–88 (7th Cir.1984).[1]

This court finds that Means has failed to sustain its burden to prove these requirements on each of its claims, and for this reason the court will deny the motion for a preliminary injunction.

## I. THE TORTIOUS INTERFERENCE WITH CONTRACT CLAIM

■ The court heard testimony regarding the damages caused by the loss of Means customers to RUS. This testimony has persuaded the court that the plaintiff can calculate these damages and thus has an adequate remedy at law to compensate for its losses. Witness for the plaintiff, Timothy Pruett, testified that loss reports are generated whenever a customer terminates a contract. Means usually offers to settle a wrongful termination claim against a customer for forty percent of the gross revenues anticipated from the completed contract. This dollar amount is readily ascertainable and is included in the correspondence in which the customer is informed of the wrongful termination. The court concludes that this amount represents the entire loss incurred by Means when a customer breaches a contract; no evidence suggests that Means suffers an additional intangible loss (such as loss of good will). For this reason, injunctive relief will be denied on the claim for tortious interference with existing contractual relations.

## II. THE RESTRICTIVE COVENANT CLAIM

The court can grant Means' request for an injunction only if the court finds that the contract provision upon which Means bases its request is enforceable. Illinois courts have addressed the problem of enforceability of post-employment restrictive covenants on numerous occasions. Central to the question of whether such covenants are enforceable is the existence of a protectable business interest. The cases uniformly require a party to show one of the following elements to establish a protectable business interest: (1) the employees have gained confidential information from the employment relationship, or (2) the employer has a near permanent relationship with its customers and, but for the employment, the employee would not have had contact with the customers. *American Hardware Mutual Ins. Co. v. Moran*, 545

---

**1.** In one recent case, the Seventh Circuit stated that a district court should grant a preliminary injunction "if but only if $P \times Hp > (1-P) \times Hd$," where P represents the probability that the denial of an injunction would be erroneous (which is the probability that the plaintiff would win at trial); Hp, the irreparable harm the plaintiff would suffer if the injunction is not granted; and Hd, the irreparable harm the defendant would suffer if the injunction is granted. *See American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986). The Seventh Circuit has insisted that this algebraic formula does not represent a new standard for granting preliminary injunctions. *Id. See also Brunswick Corp. v. Jones*, 784 F.2d 271, 274 n. 1 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433–36 (7th Cir.1986). Rather, the formula is supposed to be "just a distillation" of the well-established, five-prong test for granting preliminary injunctions. *See American Hospital*, 780 F.2d at 593.

In application, the formula is more unwieldly than its clean, algebraic expression suggests. Thus, with great interest (and some relief), the court heeds the Seventh Circuit's admonition:

As a distillation, the formula admirably reflects the balancing of irreparable harms inherent in the traditional test. However, a formula, of necessity, cannot incorporate all of the elements of the traditional test. We note, therefore, that before the district court balances the irreparable harms suffered by the parties, the plaintiff still must establish the other prerequisites to the issuance of a preliminary injunction—namely, that the plaintiff has no adequate remedy at law; that it has a reasonable likelihood of prevailing on the merits; and that an injunction would not harm the public interest.

*Brunswick*, 784 F.2d at 274 n. 1.

F.Supp. 192 (N.D.Ill.1982), *aff'd* 705 F.2d 219 (7th Cir.1983) (injunction against insurance salesperson denied); *Pratt v. Blunt, et al.,* 140 Ill.App.3d 512, 94 Ill.Dec. 815, 488 N.E.2d 1062 (5th Dist.1986) (lawyers enjoined from soliciting clients from old firm); *Reinhardt Printing Co. v. Feld,* 142 Ill.App.3d 9, 96 Ill.Dec. 97, 490 N.E.2d 1302 (1st Dist.1986) (injunction against commercial printing salesman denied); *McRand, Inc. v. VanBeelen,* 138 Ill.App.3d 1045, 93 Ill.Dec. 471, 486 N.E.2d 1306 (1st Dist.1985) (injunction appropriate against former vice president of coordinating management and incentive award programs); *American Claims Service, Ltd. v. Boris, et al.,* 137 Ill.App.3d 948, 92 Ill.Dec. 723, 485 N.E.2d 534 (1st Dist.1985) (injunction against insurance adjusters denied); *Morrison Metal Weld Process Corp. v. Valent,* 97 Ill. App.3d 373, 52 Ill.Dec. 825, 422 N.E.2d 1034 (1st Dist.1981) (injunction appropriate against secret welding process salesman); *Hayden's Sports Center, Inc. v. Johnson,* 109 Ill.App.3d 1140, 65 Ill.Dec. 612, 441 N.E.2d 927 (2nd Dist.1982) (injunction against sporting goods salesman denied); *Donald McElroy, Inc. v. Delaney,* 72 Ill. App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist.1979) (injunction against buyers of photographic waste material denied); *Image Supplies, Inc. v. Hilmert,* 71 Ill. App.3d 710, 28 Ill.Dec. 86, 390 N.E.2d 68 (1st Dist.1979) (injunction against printing supplies salesman denied); *Nationwide Advertising Service, Inc. v. Kolar,* 28 Ill. App.3d 671, 329 N.E.2d 300 (1st Dist.1975) (injunction against recruitment advertising salesman denied).

■ The court concludes that the information gained by the individual defendants during their employment by Means does not rise to the level of "confidential information." Testimony indicated that price is the single most competitive factor in the textile rental industry and customers freely reveal the prices they are paying to determine whether they can obtain a lower one. None of the individual defendants carried away any of the documents which show Means' rate schedules, pricing structures, replacement rates, cost cards or customer cross-reference lists. Moreover, those informational items are in a continuing state of change and the information contained in them is valid for only about one month. The individual defendants did not gain any intimate personal knowledge of the operation of the customers' business. The number of clean towels required by a business and the frequency with which they are needed is not vital confidential business information. For discussion of the sorts of information courts have considered confidential, see *American Hardware Mutual Ins. Co. v. Moran,* 545 F.Supp. 192 (N.D.Ill. 1982), *aff'd* 705 F.2d 219 (7th Cir.1983); *Hayden's Sport Center, Inc. v. Johnson,* 109 Ill.App.3d 1140, 65 Ill.Dec. 612, 441 N.E.2d 927 (2nd Dist.1982); *Donald McElroy, Inc. v. Delaney,* 72 Ill.App.3d 285, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist. 1979).

The skills that the individual defendants acquired while they were employed by Means were general skills—knowledge that would have been acquired by any employee in a similar situation. Those skills do not constitute "confidential information." Thus, the plaintiff failed to establish a protectable business interest based upon the use of "confidential information."

The plaintiff could nonetheless prevail, however, by showing that it enjoyed a near permanent relationship with its customers, and that but for the employment, the employee would not have had contact with the customers. In determining whether a near permanent relationship exists, courts consider a number of factors: (1) the number of years the employer requires to develop the clientele; (2) the amount of money invested in developing clientele; (3) the difficulty with which the employer develops the clientele; (4) the importance of personal customer contact by the employee; (5) the kinds of knowledge that the employee gains about customers through contact with the customers; (6) the length of time customers have been associated with the employer; and (7) the continuity of the relationship with the customer. *McRand, Inc. v. Van Beelen,* 138 Ill.App.3d 1045,

1051–53, 93 Ill.Dec. 471, 486 N.E.2d 1306 (1st Dist.1985).

In the *McRand* case, for example, the plaintiff spent one to three years and hundreds of thousands of dollars to develop a customer. The development of a customer was a difficult process. The development required an indepth awareness of the customer's business organization. The employees enjoyed personal customer contact, through which they gained inside knowledge of such things as the customer's buying habits, profit margins, and future business plans.

The facts of this case, in contrast, make clear that Means does not have a near permanent relationship with its customers. Certainly, the route representative of the Means company lacked intimate knowledge of customers' business practices. It is true that many Means customers had been customers for a long time. But the length of time is not indicative of a closed market or reliance on special services provided by Means. To the contrary, the evidence indicates that price and punctual service are the deciding factors, not personal customer relationships.

Furthermore, the court cannot find that, but for the employment, the employees would not have had contact with Means customers. Competitors had easy access to all Means customers, and textile rental service is largely developed by "cold calls." [2] These facts negate the second factor of the permanent relationship test.

Because the court finds that Means has not established a protectable business interest in the customer relationships at issue, an inquiry into whether the covenants were actually breached is unnecessary. Without a protectable business interest, Means has no reasonable likelihood of success on the merits of this claim. In *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 387 (7th Cir.1984), the Seventh Circuit noted that although the plaintiff must demonstrate some probability of success on the merits, "the threshold is low. It is enough that 'the plaintiff's chances are better than negligible....'" (quoting *Omega Satellite Products Co. v. Indianapolis* 694 F.2d 119, 123 (7th Cir. 1982)). Moreover, the degree of likelihood of success on the merits which the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in the plaintiff's favor. *See Roland*, 749 F.2d at 387–88. *See also Brunswick*, 784 F.2d at 275.

In this case, however, the plaintiff's chances of prevailing on the merits of the contract claim are not even negligible. The plaintiff has not demonstrated that the balance of harms weighs so heavily in the plaintiff's favor that this court should overlook the unenforceable nature of the contract provision on which the plaintiff bases its claim.

## CONCLUSION

In sum, the plaintiff has failed to show that it lacks an adequate remedy at law with respect to its tortious interference claim, and it has failed to prove a reasonable likelihood of success on the merits which would support injunctive relief with respect to its breach of contract claim.

IT IS THEREFORE ORDERED that the plaintiff's motion for preliminary injunction is denied.

---

**2.** A salesperson makes a "cold call" when the salesperson solicits business from a potential customer who has been found, for example, in the phone directory or by passing the potential customer's place of business. The meeting is a "cold call" because the salesperson has had no previous contact with the potential customer.