PACKARD INSTRUMENT COMPANY, INC., Plaintiff-Appellant, *v.* ANDREW R. REICH *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 79-1403

———

Opinion filed October 22, 1980.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Stanley J. Davidson, Donald L. Mrozek, and William J. Holloway, of counsel), for appellant.

Arnstein, Gluck, Weitzenfeld & Minow, of Chicago (Arthur L. Klein, Richard K. Wray, and Reed R. Kathrein, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Packard Instrument Company, brings this interlocutory appeal from an order denying its motion for a preliminary injunction which sought to restrain defendants, Andrew R. Reich, Peter Mertens, Jr., and Radiomatic Instruments and Chemical Company, Inc., from selling certain scientific instruments.

Packard, a corporation, is involved in the invention, development, marketing, and manufacture of scientific instruments for the scientific research market. Reich and Mertens were employed by Packard until their resignations on October 1, 1978, and September 1, 1978, respectively. Upon leaving Packard, Reich and Mertens went to work at Radiomatic, a corporation which they formed and incorporated in 1978. Radiomatic is engaged in the manufacture and sale of instruments used in scientific research. In a March 1979 trade publication, Radiomatic advertised two microprocessor controlled scientific instruments for sale: the "Flo-One," a flow system for radiation detection, and the "Oxi-One," a sample oxidizer.

Packard's complaint for injunction alleged, in part, that Reich, as former director of research, had access to Packard's highly confidential research and marketing information concerning liquid scintillation equipment incorporating microprocessors; that Mertens, as former product specialist, had been involved in the planning and marketing of a sample oxidizer under development by Packard; that the two men organized

Radiomatic for the purpose of manufacturing and developing products competitive to those sold by Packard; and that the two instruments are directly competitive with some of Packard's existing products. Packard further charged that Reich and Mertens breached their employment agreements with Packard by planning and organizing a competing business while employed by Packard; by refusing to offer Packard "originations" they developed at Packard; and by contacting customers on behalf of Radiomatic within one year of terminating their employment with Packard. Packard alleged that it had no adequate remedy at law and that it would suffer irreparable injury if defendants continued to sell the instruments.

At the hearing on the request for a preliminary injunction, the following relevant evidence was adduced: Packard maintains several laboratories and an engineering department. Its laboratories are locked at all times, and only certain personnel are provided with keys. To insure the confidentiality of developments at Packard, employees are instructed to record their ideas and data in laboratory notebooks which are stored in a locked area. An instruction in the notebook provides: "This notebook and its contents are the exclusive property of the Company. It is confidential and the contents are not to be disclosed to anyone unless authorized by the Company * * *." In addition, employees are requested to sign an employment agreement which reads, in relevant part, as follows:

"As a result of employment of EMPLOYEE by EMPLOYER * * *, EMPLOYEE will be informed of and placed in knowledgeable contact with EMPLOYER's research development and design projects, manufacturing procedures and problems, sales programs and relationships to customers generally and specifically, or long range planning programs. EMPLOYEE has already learned, or will have disclosed to him, many facets of EMPLOYER's confidential business information and trade secrets which are not known or available to the public, including some or all of the following:

(a) The nature of inventions made by him or co-employees, and evaluations of their potential commercial importance and patentability;

(b) Plans for contemplated improvements in existing Products or new Products, * * *;

(c) Details of the engineering design of Products * * *;

(d) Manufacturing methods or procedures pertaining to Products * * *;

* * *

EMPLOYEE acknowledges that all of the foregoing constitutes valuable, confidential information and assets which, if disclosed

to, or used to the advantage of, any of EMPLOYER's competitors, would involve serious and irreparable detriment to EMPLOYER and its business efforts.

Further EMPLOYEE acknowledges that he may be dealing with research, design, development * * *, and that he will be using EMPLOYER's facilities and work time in attempting to solve problems or reach desired objectives. To the extent that inventions, discoveries, ideas or proposals pertaining to Products or EMPLOYER's business are conceived by EMPLOYEE, all rights (including patent rights) therein logically and fairly belong to Employer. * * *

In cognizance of the foregoing, * * * and in further consideration of EMPLOYER employing him and the salary or other compensation paid to him by EMPLOYER * * *, EMPLOYEE herewith binds himself and agrees to the following:

* * *

2. EMPLOYEE hereby agrees to assign, and does hereby assign, to EMPLOYER, its successors and assigns, all of his right, title and interest in and to ideas, discoveries, proposals and inventions (whether patentable or unpatentable) which (a) he may make or conceive either solely or jointly with others during the EMPLOY-MENT, and which (b) relate to any subject or problem associated with EMPLOYER's engineering, research, development, manufacturing or sales activities involving EMPLOYER's Products or commercial developments or activities logically related to Products. The ideas, proposals, discoveries, and inventions as defined in the preceding sentence are hereinafter collectively called ORIGI-NATIONS. EMPLOYEE agrees to disclose in writing to EMPLOY-ER all ORIGINATIONS promptly after they are made or conceived.

* * *

5. EMPLOYEE further promises promptly to disclose fully in writing to EMPLOYER all ORIGINATIONS which he may make or conceive during a period of six months immediately following the termination, for any reason, of his EMPLOYMENT. EM-PLOYEE promises that if EMPLOYER so requests in writing within three months following the date of any such post-EMPLOY-MENT disclosure, EMPLOYEE will sell and assign to EMPLOYER all of his right, title and interest in and to the ORIGINATION so disclosed in return for payment by the EMPLOYER of a lump sum to be mutually agreed upon, but which in no case shall exceed $500. * * *"

Dr. Leroy J. Everett, vice-president and assistant general manager of

Packard, testified that Packard has developed, but not marketed, a prototype for a radioactivity detector for liquid chromatography. Dr. Everett indicated that this detector was in development stages for three to four years. The function of such instrument is to measure low energy radiation in a flowing stream. The major components of a radioactivity detector are a detector, a pump to combine two solutions, and a mixing device. Other companies market radioactivity detectors, but with the exception of the Flo-One, none are microprocessor controlled. Packard markets a liquid scintillator counter and a flo-cell. Packard also manufactures an instrument designated the "Model 306 Tri-Carb Sample Oxidizer," and has been developing various models of sample oxidizers for 11 years. A flow diagram of the sample oxidizer is contained in its operation manual and has been made available to the general public. A sample oxidizer converts a radioactive sample into tritium and Carbon 14, which gases are then trapped in separate vials. Basic components of an oxidizer include a combustion chamber and trapping sections for tritium and Carbon 14. Other manufacturers market sample oxidizers with these essential components. With the exception of the Oxi-One, no other oxidizer on the market is microprocessor controlled.

Reich testified that, prior to his employment at Packard, he worked as an analytical and instrument chemist for approximately 10 years. From January 2, 1974, to October 1, 1978, Reich was employed by Packard, advancing from the position of senior design engineer, to manager of research engineering, and finally, to director of research. Two weeks after his employment began, Reich signed the aforementioned employment agreement. As manager of research engineering, Reich was responsible for the development of new instrumentation. His duties as director of research included investigating new concepts and exploring new products which were not within Packard's existing product line. During his employment, Reich had access to the laboratories and to confidential information concerning sample oxidizers and radioactivity detectors under development by Packard. At Packard's expense, Reich attended a public seminar on microprocessors, which are miniaturized switching devices. Reich testified that while employed by Packard, he was involved in the development of the use of the microprocessor in various scientific instruments, but did not work on it specifically in connection with a flow system for radiation detection.

In 1974, Reich suggested to Edward Polic, then Packard's vice president of sales and marketing, that the company should develop a flow system for radiation detection since there was a market for such a product. Reich also discussed this suggestion with Dr. Everett. Reich recorded his ideas and development concepts regarding a flow system on approximately 12 pages in his laboratory notebook. Packard had access

to the notebook. Reich also prepared and submitted to Packard's planning committee a proposal for a flow system radioactivity detector. Although Packard had the technical ability to produce the instrument, the committee rejected the proposal because of priorities and marketing considerations. Reich testified that, in 1975, he offered Packard the concept and design of a flow system, as described in his notebook, which was very similar to the Flo-One. Reich stated that the instrument specified in the notebook, if developed by Packard, could have been exactly the same as the Flo-One.

Mertens, who had an education in electronics, was first employed by Packard from 1969 to July 1974, in the capacity of technical specialist, sales and service specialist, and assistant product manager. He executed the foregoing employment agreement in 1973. Mertens left Packard's employ, but returned in 1975 and remained there until his resignation on September 1, 1978. He signed no employment agreement after his return. During his second period of employment, Mertens was a product specialist for sample oxidizers, and had access to plans, specifications and drawings of model oxidizers under development. Mertens lacked expertise on microprocessors and did no work with them.

In 1975, Mertens suggested to Polic and Dr. Everett that Packard develop and market a low-cost oxidizer. He submitted a general proposal for a low-cost sample oxidizer to Packard's planning committee. The committee rejected the proposal due to priorities and marketing considerations. Mertens disclosed to Packard all of the work he performed on sample oxidizers during his employment. He did not conduct any development work on the Oxi-One while employed by Packard, and he took no drawings of Packard's oxidizer upon his departure.

In April 1978, Reich and Mertens discussed the formation of a corporation to sell scientific instruments and the concept and marketing of a sample oxidizer and radioactivity detector. They incorporated Radiomatic in August 1978, having earlier asked Polic to become a director. Reich and Mertens testified that they did not perform any work for or receive any salary from Radiomatic prior to leaving Packard. After leaving Packard, Reich spent approximately 800 to 1000 hours developing the Flo-One; Mertens worked 2,000 to 2,500 hours on the Oxi-One project. With the exception of various chemicals, the Flo-One and the Oxi-One are the only products Radiomatic offers for sale.

Following the March 1979 advertisement, the Flo-One and Oxi-One were offered for sale at a trade show in April 1979. At the show, defendants displayed boxes resembling the instruments which contained few, if any, operational components. Thereafter, defendants received one purchase order for each instrument and, from contacts with 25 customers expressing interest in the products, expect at least 15 additional

orders. At the time of the hearing, some manufacturing had begun, but neither instrument had yet been produced as a complete operational model. Reich indicated that design on the Flo-One began in 1979 and is almost complete. While the idea for the Oxi-One was conceived in the 1970's the instrument is still being developed.

The witnesses testified as to the characteristics of Flo-One and Oxi-One and the corresponding instruments developed or produced by Packard. Dr. Everett testified that the apparent difference between the Flo-One and Packard's prototype detector was that the Flo-One is microprocessor controlled. He also stated that the Packard flo-cell is incorporated into the Flo-One. Reich testified, in contrast, that the flo-cell contained in the Flo-One was not the flo-cell disclosed in the notebook. Unlike the flo-cell described in his Packard laboratory notebook, the flo-cell used in the Flo-One has coiled teflon tubing. Reich also stated that the Flo-One does not incorporate any novel ideas or innovations.

Dr. Everett further testified that the Oxi-One and Packard's sample oxidizer appear to share the same function and essential components except that the Oxi-One is microprocessor controlled. In contrast, Mertens stated that, unlike Packard's oxidizer, the Oxi-One is a low-cost oxidizer using a passive rather than active ignition device; has a glass rather than a metal trapping device; uses a combustion tube instead of an open-closed flame system or catalytic combustion device; and is microprocessor controlled. He explained that a microprocessor component can be purchased from a catalog or electronic supply store; it is not an item manufactured or developed by either Packard or Radiomatic. The expertise on microprocessors for the Oxi-One and Flo-One was supplied by an independent consultant. Mertens did not use drawings in the manual of Packard's sample oxidizer in constructing the Oxi-One. Rather, he relied upon his expertise developed over 10 years and a prototype produced by a European company.

Dr. Everett testified that techniques and technology associated with programming microprocessors, developed by Packard and not known by the general public, were used in the instruments offered by defendants. He stated that if defendants were permitted to sell the two scientific instruments in issue, Packard would lose the years and money invested in the research and development of its sample oxidizers and radioactivity detector.

On appeal Packard contends that the uncontradicted evidence demonstrates that it is entitled to a preliminary injunction as a matter of law.

■▌ We reject Packard's initial argument that the discretion ordinarily afforded a trial court's decision to deny a preliminary injunction must be circumspectly applied here because the record demonstrates that the court did not understand the facts and issues presented. Packard points

out that during closing argument, despite the evidence and exhibits, the trial court inquired about the function, size and appearance of the instruments and remarked that Reich and Mertens still remained in Packard's employ. The record reveals, however, that prior to issuing its ruling, the court acknowledged the function and appearance of the instruments and was apprised of the current employment status of the two men. While the order denying injunctive relief fails to specify the basis for its entry, the real issue on review is whether the order itself is correct. See *Stigler v. City of Chicago* (1971), 48 Ill. 2d 20, 268 N.E.2d 26.

■■■ To justify issuance of a preliminary injunction, the movant must establish (1) possession of a certain and clearly ascertained right which needs protection; (2) immediate and irreparable injury if the injunction is denied; (3) no adequate remedy at law; and (4) likelihood of ultimate success on the merits of the case. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1978), 62 Ill. App. 3d 671, 379 N.E.2d 1228.) As this appeal arises from the denial of a preliminary injunction, the merits or substantive issues of the cause have not yet been determined. We therefore will address the substantive issues only to the extent it is necessary to determine whether the trial court abused its broad discretionary powers in denying the requested relief. *Central Building & Cleaning Co. v. Vodnansky* (1980), 84 Ill. App. 3d 586, 406 N.E.2d 32; *Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.

Packard urges that it established the possession of a certain and clearly ascertained proprietary right to the two instruments being promoted by defendants. It first claims that such right is derived from paragraphs 2 and 5 of the employment contract executed by Reich and Mertens. Paragraph 2 requires the employee to assign to Packard all of his right, title and interest in ideas, discoveries, proposals, and inventions, collectively referred to as "originations" conceived during the employment or relating to Packard's activities. Under paragraph 5, the employee promises to disclose and, upon request, assign all originations made during a period of six months following termination of employment at Packard. Packard charges that the ideas behind the Oxi-One and Flo-One were conceived of, developed, and made the subject of formal proposals by Reich and Mertens while they were Packard employees, and that the instruments were offered for sale within six months of defendants' departure from Packard.

Defendants counter that the evidence fails to disclose the existence of any protectible interest belonging to Packard or to demonstrate that defendants violated any contractual duty. More specifically, defendants assert that Mertens did not execute and thus was not bound by the employment agreement during his second period of employment; that

this case does not involve any "originations," discoveries or inventions; and that the concepts behind the instruments were well known to the industry and were not unique, innovative or novel.

From our view of the record, we find contradictory testimony as to whether originations were involved. It is undisputed that Reich submitted a proposal to Packard for a flow system radioactivity detector which was similar to, and which, if developed, could have been exactly like the Flo-One. The concept behind such system was described in the laboratory notebook to which Packard had access. It is also uncontested that during his employment at Packard, Mertens submitted a general proposal for the development and marketing of a low-cost sample oxidizer. Also undisputed is that the Flo-One and Oxi-One share similar functions and basic components as their counterparts produced by Packard, and that no other radiation detectors or sample oxidizers on the market are microprocessor controlled.

Yet, other evidence suggests that the instruments in question were not based upon unique ideas or particularized proposals under development at Packard during defendants' tenure. First, other companies market radioactivity detectors and sample oxidizers having the same essential components found in corresponding Packard and Radiomatic instruments, with the exception of the microprocessor control. Reich stated that the flo-cell contained in the Flo-One differed from the flo-cell described in his laboratory notebook. He also indicated that the Flo-One did not incorporate any innovations or novel ideas unknown to the trade. Testimony disclosed that Mertens submitted a general proposal for development of a low-cost sample oxidizer, but that neither he nor Packard conducted any development work on the Oxi-One during his employment at Packard. Mertens' unrefuted testimony indicated that in designing the Oxi-One he relied not on drawings from the manual of Packard's sample oxidizer, but rather upon his expertise developed over 10 years and a prototype produced by a European company. There were also several dissimilarities in the construction of the Oxi-One and Packard's oxidizer.

Packard further maintains that its exclusive property right to the instruments is based upon the common law fiduciary duty precluding an employee from disclosing or using for his own advantage confidential information acquired during the course of his former employment. Defendants counter that no trade secrets or confidential disclosures are involved here.

■■ Upon termination of employment, an employee cannot take confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which afford the employer an

advantage over competitors. An employee may, however, take with him general skills and knowledge acquired during his former employment. (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225; see also *Armour & Co. v. United American Food Processors, Inc.*) Matters which are generally known in the trade cannot be made secret by being so labelled in an agreement. *Sarkes Tarzian, Inc. v. Audio Devices, Inc.* (S.D. Cal. 1958), 166 F. Supp. 250, *aff'd* (9th Cir. 1960), 283 F.2d 695, *cert. denied* (1961), 365 U.S. 869, 5 L. Ed. 2d 859, 81 S. Ct. 903.

Uncontroverted evidence revealed that Packard exercised precautions to insure the confidentiality of research data by various methods. Proof of these safeguards alone, however, does not establish that a particular process or instrument is secret or based upon confidential information, especially where the process is known and used by the outside world. (See *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 132 N.E. 806.) Nor does the fact that defendants had access to confidential data or had a confidential relationship with Packard demonstrate conclusively that defendants appropriated or used confidential information in developing their instruments.

Dr. Everett mentioned only microprocessor programming techniques and technology as ideas which were developed by and known only to Packard and incorporated into defendants' instruments. Defendants offered testimony, however, that the microprocessor expertise used in both instruments was provided by an independent consultant, not Reich or Mertens. Moreover, neither Packard nor Radiomatic manufactures microprocessors. In addition, Reich's training in the use of microprocessors was acquired through a seminar which was open to the public. We therefore find that Packard has not conclusively established by uncontroverted evidence that the instruments incorporate any confidential information imparted to or developed by defendants as Packard employees.

The trial court made no express finding as to whether Packard possessed a certain and clearly ascertained right which needs protection. We deem it inappropriate at this stage to express an opinion as to whether the two instruments incorporate "originations" or confidential disclosures or are based upon defendants' general skills and knowledge. These are substantive issues to be resolved at a trial on the merits. At proceedings on the permanent injunction, Packard will have an opportunity to demonstrate that the concepts of the two instruments were embodied in the laboratory notebooks or proposals submitted by defendants, or to show that defendants used Packard's proprietary or confidential data in constructing the products. Defendants will be allowed to offer evidence to refute these claims. See *Central Building & Cleaning Co. v. Vodnansky*.

We determine that, based upon the evidence presented, the trial court properly could have concluded that Packard failed to establish the existence of a proprietary right to the instruments, and thus we hold that the denial of preliminary injunctive relief did not constitute an abuse of discretion. We are not persuaded that the uncontradicted evidence demonstrates that Packard is entitled to a preliminary injunction as a matter of law.

Accordingly, the order of the circuit court of Cook County denying Packard's request for preliminary injunctive relief is affirmed.

Order affirmed.

SIMON and RIZZI, JJ., concur.