These appeals involve a suit on a promissory note and a counterclaim for fraud, which arose from a series of real estate transactions concerning a tract of land located on the Intra-Coastal Canal Waterway ("the canal property") near Gulf Shores, Alabama. On November 13, 1981, Frank J. Caron, a real estate investor, purchased the canal property for $617,000. Caron subsequently sold a portion of the property to Talb, Inc., in 1985 for $400,000. Talb paid $60,000 down and gave Caron a promissory note for $340,000.
On January 4, 1988, Caron assigned the Talb promissory note to Dot Dot Corporation for $347,000. On March 3, 1988, Dot Dot filed suit on the Talb promissory note, alleging that Talb was in default. A default judgment was taken on June 29, 1988, in the amount of $488,790.88.[1]
On October 13, 1988, Talb filed a motion for relief from judgment, pursuant to Rule 60(b)(4) and (6), A.R.Civ.P., averring "that the judgment entered by this court on June 29, 1988, is void because the court lacked *Page 1055 
jurisdiction over the parties and that the rendition of the judgment was inconsistent with due process." Talb's motion was granted by the trial court, which vacated the default judgment entered June 29, 1988. Talb then filed an answer to the complaint, denying the allegations and raising the affirmative defenses of release and estoppel. On January 13, 1989, Dot Dot filed a motion for summary judgment on the promissory note. On February 3, 1989, Talb amended its answer to Dot Dot's complaint and raised additional affirmative defenses. On March 24, 1989, Talb filed its second answer and a counterclaim that alleged that the sale of the property was procured by fraud. On March 27, 1989, the trial judge entered a preliminary order granting Dot Dot's motion for summary judgment on the claim based on the note. On May 24, 1989, the trial judge entered a final judgment against Talb in the amount of $456,081.10.[2] Talb appeals from this judgment. Dot Dot cross-appeals with respect to the attorney fees of $25,000 awarded by the trial court; Dot Dot contends this award was insufficient and an abuse of discretion by the trial court.
The facts of the case are as follows: After Caron acquired the canal property, he let it be known in the real estate community that he was willing to sell the property for $1,000 per foot. He did not list the property with any realtor. In the latter part of 1984, Walter Blaylock, a real estate broker, contacted Walter Edmond Thornton-Trump ("Trump"), an inventor-industrialist and president of Talb, and asked Trump if his company would be interested in buying a portion of this property. The property was shown to Trump by Edgar Smith, a real estate associate of Blaylock's. Trump contends that Blaylock and Smith were agents of Caron and that they made certain representations to Trump in order to fraudulently induce Talb to purchase the property.
The plaintiff contends that, by a document signed by Walter Blaylock "as agent for Ted Thornton-Trump, TALB, Inc.," Talb offered to purchase a portion of this tract from Caron for $400,000. This offer to purchase provided:
 "It is expressly understood by purchaser that conveyance of the subject property shall be subject to any and all existing easements and rights-of-way for roads, utility lines, any pipelines running over, under, through, or across the subject property, or any part thereof, whether visible or not, and whether of record or not, and further subject to any restrictions, reservations, or covenants affecting the use of said land."
Trump argues that he never authorized this offer of purchase, and that Blaylock was Caron's agent, not his. The minutes of Talb, which was wholly-owned by Trump and his wife, Bernice, reflect a unanimous consent of shareholders to purchase the canal property. This consent of Talb's shareholders reads, in pertinent part, as follows:
 "WHEREAS, the shareholders of TALB, INC. deem it necessary and desire to enter into a conveyance as Purchaser, with FRANK J. CARON, as Seller relating to that certain parcel of real property as described in Exhibit 'A,' attached hereto and made a part hereof. Purchase price for said real property shall not be in excess of $400,000.
 "BE IT FURTHER RESOLVED, that Walter Edmond Thornton-Trump, the President of this Corporation, be and hereby is, authorized and directed to do the following:
 "1. TO PURCHASE REAL ESTATE: To execute on behalf of the corporation, any and all documents or instruments which may be necessary or expedient in connection with the fulfillment of the purchase of the property described in the attached Exhibit 'A.' To sign any appropriate documents necessary for the financing of said purchase including, but not limited to a Vendor's Lien Deed and promissory note secured thereby.
". . . . *Page 1056 
 "BE IT FURTHER RESOLVED, that WALTER EDMOND THORNTON-TRUMP, the President of this Corporation be, and hereby is authorized and directed to grant unto Fran Andrews full power and authority to do and execute all or any of the above listed acts, deed, and things with respect to the property as described in the attached Exhibit 'A'."
Trump planned to be on a voyage on his yacht and thus unavailable at the closing. He signed a special limited power of attorney, dated February 14, 1985, and notarized by Joyce K. Hart, giving Fran Andrews the authority to execute the promissory notes and vendor's lien deed to allow Talb, Inc., to purchase the property. This special power of attorney provided that Ms. Andrews, on behalf of Trump as Talb's president, was empowered as follows:
 "I, WALTER EDMOND THORNTON-TRUMP, do hereby appoint FRAN ANDREWS, my true and lawful attorney-in-fact to act in, manage, and conduct all my affairs, and for that purpose for me and in my name, individually or as an officer of TALB, INC., place and stead, and for my use and benefit, and as my act and deed, to do and execute or to concur with persons jointly interested with myself therein in the doing or executing of, all or any of the following acts, deeds, and things, with respect to that certain real estate described in the attached Exhibit 'A', that is to say:
 "1. TO PURCHASE REAL ESTATE: To execute on behalf of the corporation, any and all documents or instruments which may be necessary or expedient in connection with the fulfillment of the purchase of the property described in the attached Exhibit 'A'. To sign any appropriate documents necessary for the financing of said purchase including but not limited to a vendor's lien deed and promissory note secured thereby. . . ." (CR-133.)
Talb purchased the property on February 21, 1985, by vendor's lien deed from Frank Caron for the sum of $400,000. Sixty thousand dollars was paid as the down payment, with a promissory note being given to Caron for $340,000. Trump now contends that he never authorized Andrews to make such a large property acquisition. In February 1986, Talb paid one annual installment on the note in the total amount of $52,700.[3]
Trump contends that before the second annual installment on the promissory note was due in 1987, he contacted Blaylock to inform him that he recognized that the property was not a good investment and directed Blaylock to dispose of the property. Trump alleges that Blaylock represented to him that Caron would take the property back by way of a deed in lieu of foreclosure. He says he relied on this statement and made no subsequent payments required by the terms of the note. Thus the note was in default when Dot Dot Corporation brought suit.
We must determine whether the trial court erred in granting the motion for summary judgment on the promissory note claim. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P.
Talb filed a counterclaim based on fraud, alleging 1) that Blaylock and Smith were agents of Frank Caron, that they made certain fraudulent misrepresentations to him about the use and value of the canal property, and that those misrepresentations induced Talb to purchase the canal property; 2) that Ms. Andrews lacked authority to execute the vendor's lien deed and promissory note for Talb, Inc.; 3) that Talb's obligations on the promissory note are excused because Caron breached the vendor's lien deed; and 4) that Caron had agreed to take a deed in lieu of foreclosure.
The elements that must be proved to sustain a fraud claim are found in Code 1975, § 6-5-101, and are recited in Earnest v.Pritchett-Moore, Inc., 401 So.2d 752, 754 (Ala. 1981):
 " 'Misrepresentations of a material fact made willfully to deceive, or recklessly *Page 1057 
without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.'
 "Under this principle there must be (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who must be damaged as a proximate result." (Citations omitted.)
See, Brewton v. Alabama Farm Bureau Mut. Cas. Co.,474 So.2d 1120, 1123 (Ala. 1985), and Sessions Co. v. Turner,493 So.2d 1387, 1389 (Ala. 1986).
We have carefully examined the record in this case. This is a suit on a valid promissory note. The allegations of fraud made by Talb are not supported by the evidence. Trump testified by deposition that Blaylock had shown him the canal property. He characterized the representations made by Blaylock as being "a real sales pitch" and admitted that he had recognized them as a sales pitch. Trump stated in his deposition that he recognized there had been no guarantee that he would make money on the property. (R.166.) The sales pitch did not rise to the level of a material misrepresentation: there is no evidence that the statements were made with the intent to deceive, and there could have been no justifiable reliance on the sales pitch. Further, there is no evidence of any agency relationship between Blaylock and Caron. In his deposition, Blaylock stated that he was representing himself as a real estate broker and that he was not Caron's agent. (R. 587.)
Trump next avers that Andrews lacked the authority to execute the vendor's lien deed and the promissory note for Talb. This is simply not supported by the evidence. The unanimous consent given by Trump and his wife, the sole stockholders of Talb, authorized Trump to buy the canal property and to authorize Andrews to serve as Talb's agent at the closing. Trump executed a special power of attorney before a notary public so authorizing Andrews. He made the down payment on the property and paid the first installment on the promissory note.
Talb also asserts that its obligations on the promissory note are excused because, it says, Caron breached the vendor's lien deed. This argument has no merit.
Finally, Trump argues that Caron agreed to take the canal property back in lieu of pursuing Talb on the promissory note. There is no evidence that Trump and Caron had ever had a conversation. There is also no evidence that Blaylock attempted to make such an agreement, or that he had any authority from Caron to make any such agreement concerning this property.
We said in Lamb v. Opelika Production Credit Ass'n,367 So.2d 957 (Ala. 1979):
 "The party seeking relief on the ground of fraud bears the burden of proof. Mangina v. Bush, 286 Ala. 90, 237 So.2d 479 (1970). Fraud, which is never presumed, must be clearly and satisfactorily proven. Southern Ry. Co. v. Arnold, 162 Ala. 570, 50 So. 293 (1909)."
Id. at 960. Talb has failed to prove the elements necessary to support a counter-claim for fraud in this case. Viewing the facts of this case most favorably to Talb, we fail to find any issue of material fact. The trial court did not err in granting Dot Dot's motion for summary judgment on the promissory note. A.R.Civ.P. 56.
The final issue before us is whether the attorney fee of $25,000 awarded in this case is reasonable. Dot Dot contends that the award was unreasonable and constitutes an abuse of discretion by the trial court. Dot Dot argues that the $25,000 fee constitutes only 5.8% of the total principal and interest awarded and is, therefore, insufficient.
This court set forth the relevant factors to be considered in awarding attorney fees, in the case of Peebles v. Miley,439 So.2d 137 (Ala. 1983). The first six factors were set forth by Justice Somerville 78 years ago:
 " 'The general principle is everywhere established that an attorney is in such a case entitled to reasonable compensation for his services, appropriate to his employment, rendered by him to his client. — Humes v. Decatur, etc., Co., 98 Ala. 461, *Page 1058 
470, 13 So. 368. In the estimation of their value many elements may be material for consideration, among which are the nature and value of the subject-matter of the employment; the learning, skill and labor requisite to its proper discharge; the time consumed; the professional experience and reputation of the attorney; the weight of his responsibility; and the measure of success achieved.' "
Id. at 140, quoting Faulk Co. v. Hobbie Grocery Co., 178 Ala. 254,59 So. 450 (1912). Forty years after Faulk Co. was written, Justice Simpson added an additional factor, "that in determining a reasonable attorney's fee, the trial judge should take into consideration the reasonable expenses incurred by the attorney." See Peebles v. Miley, at 140.
Peebles adopted an additional five factors from DR 2-106(B) of the American Bar Association's Model Code of Professional Responsibility (1982):
"1. Whether a fee is fixed or contingent.
 "2. The nature and length of a professional relationship.
 "3. The fee customarily charged in the locality for similar legal services. . . .
 "4. The likelihood that a particular employment may preclude other employment.
 "5. The time limitations imposed by the client or by the circumstances."
439 So.2d at 141.
Peebles v. Miley was followed by Reynolds v. First AlabamaBank of Montgomery, N.A., 471 So.2d 1238 (Ala. 1985), in which this court again spoke to the issue of attorney fees. We noted that Alabama follows the "American rule":
 " 'In Alabama, attorney's fees are recoverable only where authorized by statute, when provided in a contract, or by special equity, such as in a proceeding where the efforts of an attorney create a fund out of which fees may be made. Shelby County Commission v. Smith, 372 So.2d 1092 (Ala. 1979); State ex rel. Payne v. Empire Life Ins. Co., 351 So.2d 538 (Ala. 1977).' "
471 So.2d 1238 at 1241, quoting Eagerton v. Williams,433 So.2d 436, 450 (Ala. 1983).
The trial court held a hearing on April 13, 1989, to determine the question of reasonable attorney fees. The court heard testimony from Edward B. McDonough, Jr., of Mobile and James R. Owen of Bay Minette, both practicing attorneys. Testifying for the plaintiff, McDonough suggested a fee of one-fifth up to one-third of the outstanding principal and interest. (R. 38.) Testifying for the defendant, Owen stated that a fee that was 5% of the judgment would be reasonable in this case. (R. 54.) The plaintiff's attorney, James B. Newman, testified that his firm had spent 300 hours on the case. (R. 26-27.) The trial judge stated in his final judgment that the court had considered the relevant factors enunciated inPeebles v. Miley, supra, in determining the fee. The award of an attorney fee of $25,000 made by the trial court was clearly within the guidelines established by this Court. The trial court did not abuse its discretion in awarding this fee.
AFFIRMED.
HORNSBY, C.J., and JONES, HOUSTON and KENNEDY, JJ., concur.
[1] Representing $407,325.88 in principal and interest and $81,465.00 in attorney fees.
[2] Representing unpaid principal of $323,000, interest due and owing as of April 13, 1989, in the amount of $108,081.10, and attorney fees in the amount of $25,000, plus costs of court.
[3] Representing $17,000 principal and interest of $35,700.