Luke Shearry and J.C. Summers, elders of the Southside Church of Christ in Opelika, Alabama, appeal from a declaratory judgment in favor of Cleveland Sanders, the church's minister. We reverse and remand.
Churches of Christ are organized and governed "according to Scripture." Elders, chosen by Biblical standards, oversee the congregation, control the church's money and property, and employ and discharge the minister. The minister has no authority or control over the church or the congregation. Church business is not conducted according to a "majority vote" of the congregation; rather, the elders have the first and final say in all matters.
Because the Southside Church of Christ did not have elders when Cleveland Sanders came to the church as its minister, his one-year employment contract (September 1990 — August 1991) was signed by several leaders among the "brethren" of the congregation. Shearry and Summers were ordained and installed as Southside's elders in June 1991.
Sanders's employment contract expired on the last Sunday in August 1991, and the elders gave Sanders a deadline for signing a new contract. Sanders refused to sign the contract, which named the elders as the employing parties instead of the "male brethren" of the congregation; therefore, the elders gave Sanders a deadline for "vacating the pulpit" and removing his possessions from the Southside minister's home. After that deadline, however, Sanders continued to live in the home and continued to preach at Southside, and the church treasurer continued to pay Sanders's salary, over the elders' objections.
Sanders requested a "congregational meeting" on September 21, 1991, which was attended by "30 to 35" of the 162 active members of Southside. At that meeting, Sanders announced from the pulpit that Shearry and Summers had been impeached and removed as Southside's elders. Because of deepening differences at Southside, a committee of Church of Christ ministers and elders from around Alabama met with Sanders, Shearry, Summers, and Southside's deacons in an attempt at conciliation.
In November 1991, the committee made its report and recommendations to Sanders, Shearry, Summers, and the deacons. The committee reminded them that 1) once a Church of Christ ordains elders, the elders "determine the expedient needs of the congregation" and are the "overseers" of the church; 2) there is no congregational or "democratic" vote in the Church of Christ; and 3) a Church of Christ minister does not have the authority to impeach an elder, but is, like the other members of the church, "under the oversight of the elders."
The committee concluded its report:
 "The preacher works at the request, guidance, and direction of the elders. He is to preach the word of God. . . . At the elders' discretion, the minister is negotiated *Page 1309 
with, hired, and released from the work of the congregation. . . .
 "Also, the brothers on the visiting committee urge the congregation to remember their responsibility to follow their elders in all matters of expediency. Members should love and esteem their evangelist [minister], but should never follow him as the 'official' leader of the congregation."[1]
The elders and deacons accepted the committee's report and recommendations, and Sanders agreed to announce to the congregation that he would recognize Shearry and Summers as the church's elders and that he would submit himself to their oversight. Instead, in a written statement distributed to the congregation in December 1991, Sanders publicly repudiated the committee's report and recommendations and refused to submit to the authority of the elders.
On January 17, 1992, Shearry and Summers sued for injunctive relief in the Lee County Circuit Court. The court conducted two hearings at which "numerous witnesses" testified. In an order dated March 11, 1992, it held that the authority for all church matters rested in the elders, and in that order it granted the relief sought, by 1) enjoining Sanders from transacting business on behalf of the church; 2) enjoining Sanders from performing services as minister of the church; 3) directing Sanders to vacate the minister's home; and 4) enjoining Sanders from using any real or personal property of the church.
On Saturday, March 7, 1992 (after the hearings but before the trial court's judgment), Sanders convened a meeting of 27 members of Southside. Shearry and Summers were not notified of the meeting. The church secretary testified that those attending the meeting voted to "disfellowship" the elders.
On Sunday, March 8, 1992, during the morning worship service, it was announced that a "congregational meeting" would be held immediately after the service. No purpose was given for the meeting, but the minutes of the meeting state that "the church matter to be heard was that of notifying Luke Shearry and J.C. Summers that the church was withdrawing fellowship from them because of their willful and persistent violation of scripture in taking Bro. Cleveland Sanders to court." (Emphasis supplied.) Summers attended the meeting, but Shearry did not. On the evening of March 8 — the day after they had been "disfellowshipped" by a "consensus of the church" — Shearry and Summers received copies of the minutes of the March 7 and 8 meetings.
On March 18, 1992, on Sanders's post-judgment motion, and after conducting another hearing, the court set aside its March 11, 1992, order of injunctive relief and entered a declaratory judgment in favor of Sanders, declaring that Shearry and Summers were no longer elders at Southside. The court based its judgment on the proposition that Shearry and Summers had been removed as Southside's elders and that "sufficient due process rights [had] been afforded [Shearry and Summers] to render their removal as elders legally sufficient." Shearry and Summers have appealed from this final judgment.
In their brief to this Court, Shearry and Summers contend that the single issue for review is "whether the elders of Southside Church of Christ of Opelika have been removed from office in accordance with the *Page 1310 
traditional discipline, customs, teachings, and usages of a Church of Christ." In essence, the appellants contend that the trial court's initial judgment granting the requested injunctive relief was correct, and that its order setting aside that judgment and entering a declaratory judgment for Sanders is erroneous, whether judged by the standard of the church's doctrines and procedural rules or by the standard of basic due process.
Sanders's only defense of the trial court's final judgment in his favor is his contention that Summers's attendance at the Sunday, March 8, 1992, congregational meeting satisfied the requisites of due process and thus validated the "disfellowshipping" of Summers. Therefore, contends Sanders, "[b]y the removal of one of the two existing elders, the Southside Church of Christ . . . effectively removedALL Elders in that a Church of Christ can have no elders unless there be at least two." (Emphasis in original.)
While Sanders's contention is flawed for several reasons, one reason is readily apparent: The removal action taken by Sanders and his supporters was accomplished on the evening of Saturday, March 7, 1992, without any notice to either of the elders. The minutes of the two meetings (Saturday, March 7, and Sunday, March 8) clearly reflect that the purpose of Saturday's meeting was the removal of the two elders and that the purpose of the Sunday congregational meeting was to inform the elders and the congregation that this action had been taken. The removal action was supposedly accomplished at the Saturday, March 7, meeting, and Summers was notified of that action during the meeting following the worship service on Sunday, March 8.
Moreover, even assuming that the Sunday meeting could be interpreted as a verification of the attempted removal that had occurred on the day before, the basic elements of due process as prescribed by the church's own rules were not complied with. According to the testimony of the appellants' "expert witnesses" (ministers of other Churches of Christ), when members of a church are attempting to remove elders, proper process requires that the members follow an established procedure intended to protect the elders' rights to due process. This procedure requires 1) that the elders be given written notice and specification of the charges before any meeting regarding the charges; 2) that the elders be given an opportunity to be heard; 3) that two or three witnesses be called to substantiate the charges; 4) that the elders be given an opportunity to confront the accusers; and 5) that the elders be given the opportunity to present evidence in their own behalf, including calling witnesses to testify.
Although we have found no Alabama cases dealing directly with the structural and procedural rules for governing a Church of Christ congregation, the appellants have favored the Court with several authorities from other jurisdictions that support our reversal in this case. See, e.g., Gipson v. Brown,295 Ark. 371, 749 S.W.2d 297 (1988) (Supreme Court of Arkansas refused to apply state corporation laws regarding inspection of corporate records that would infringe upon the doctrine of the Church of Christ); Church of Christ at Centerville v. Carder,105 Wn.2d 204, 713 P.2d 101 (1986) (Supreme Court of Washington refused to accept "majority vote" dismissing the elders because the church members had failed to follow the church's procedural rules governing such action); and StonyIsland Church of Christ v. Stephens, 54 Ill. App.3d 662, 12 Ill.Dec. 299, 369 N.E.2d 1313 (1977) (court affirmed arbitrators' finding that Church of Christ elders had sole authority to terminate the minister's employment and that his employment had been properly terminated according to established church procedures).
Furthermore, our holding is consistent with this Court's decision in Trinity Presbyterian Church of Montgomery v.Tankersley, 374 So.2d 861 (Ala. 1979), cert. denied,445 U.S. 904, 100 S.Ct. 1079, 63 L.Ed.2d 319 (1980), and the cases cited *Page 1311 
therein.[2] Accordingly, the judgment appealed from is reversed, and this cause is remanded with instructions to reinstate the order of March 11, 1992, granting the injunctive relief sought by Shearry and Summers.
This opinion was prepared by retired Justice Richard L. Jones, sitting as a Justice of this Court pursuant to § 12-18-19(e), Ala. Code 1975, and it is hereby adopted as that of the Court.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON and KENNEDY, JJ., concur.
[1] This Court finds the following portion of the committee's report to be particularly informative regarding the conduct required of a Church of Christ congregation, its elders, its deacons, and its minister:
 "Nowhere in the scriptures do we find a minister given the right to impeach an elder or deacon. Impeachment is an American concept concerning the checks and balances of government, not of our Lord's kingdom. The elders at Southside were scripturally appointed. No scriptural reason was given why they should not be ordained. The elders were properly ordained, and therefore remain the elders of the Southside congregation. The mere statement of removal or impeachment does not make it so. Again, the committee urges the congregation, including the four deacons and minister, to serve under the oversight of these two elders. To do otherwise is to violate the plain teachings of our God and Savior."
[2] The appellants have also called the Court's attention to the following statement, which they contend expresses the applicable principle: "Clearly, the civil court will not review acts of church discipline or membership expulsion where there is no question as to the invasion of civil or property rights. However, the court has jurisdiction to review an expulsion from a religious society to determine whether the expelling organization acted in accordance with its own regulations, or to determine whether it acted in accordance with the principles of natural justice. . . ." 66 Am.Jur.2d Religious Societies § 34, p. 785 (1973).