[1] This party is referred to at various places in the record as Richard L. Buckley, Richard Buckley, Jr., and Richard L. Buckley, Jr. The other party is referred to sometimes as Richard Seymour and sometimes as Richard D. Seymour.
 On Applications for Rehearing
The opinion of February 2, 1996, is withdrawn and the following opinion is substituted therefor.
Richard L. Buckley, Jr., is the sole proprietor of a paintless dent removal business operating in Alabama and other states under the trade name "Press*A*Dent." Paintless dent removal ("PDR") is a process by which a skilled craftsman, using special tools and techniques, removes dents, dings, and creases from an automobile without performing any paint work. This process is in contrast to traditional automotive body repair methods that involve sanding, filling, and repainting.
On October 10, 1991, Buckley entered into an agreement ("the Agreement") with Richard Seymour in which Seymour agreed to perform services for Buckley in the PDR business under the terms set forth in the Agreement.
Under the terms of the Agreement, Buckley agreed to provide training to Seymour in the PDR process. Seymour agreed to learn the process and to do PDR work in a designated portion of Alabama. The Agreement contained the following confidentiality clause:
 "Contractor fully understands that the process is to be for the sole and exclusive benefit of Mr. Buckley, and that Mr. Buckley intends to take all necessary precautions to carefully guard its secrecy. Consequently, Contractor agrees that he will never, directly or indirectly, use, or disclose, divulge, teach or otherwise facilitate or permit the transfer of the [Press*A*Dent] Process or related techniques and tools to anyone, other than pursuant to the terms of this Agreement."
The Agreement also contained a noncompetition clause in which Seymour agreed not to compete with Buckley for two years after the termination of the business relationship. The Agreement recites that it is to be "governed by, construed and enforced in accordance with the laws of the State of Indiana."
The parties maintained a business relationship until February 1993, when Seymour notified Buckley that he was "terminating their agreement" effective March 28, 1993. Days later Seymour began his own business operation as "The Dent Man." Buckley sued Seymour on May 12, 1993, seeking a temporary restraining order and a permanent injunction enjoining Seymour from interfering with the business or contractual relationship between Buckley and his customers.
The trial court first granted a temporary restraining order, and then, after hearing testimony, issued a preliminary injunction restraining and enjoining Seymour from, among other things, "using or disclosing to competing entities of Mr. Buckley, the process of paintless dent removal as well as any confidential information or processes learned while associated with Mr. Buckley or from using the specialized operational methodologies of Mr. Buckley; [and] using the trade name Press*A*Dent."
Seymour appealed the preliminary injunction; this Court affirmed. Seymour v. Buckley, 628 So.2d 554 (Ala. 1993). After our decision in Seymour v. Buckley, Seymour counterclaimed, alleging that he had been fraudulently induced by Buckley into signing the Agreement. *Page 223 
A jury trial was held January 9-13, 1995. The trial judge submitted the case to the jury on Buckley's contractual claims and on Seymour's counterclaim. The jury returned a general verdict in favor of Buckley on his complaint and against Seymour on his counterclaim. The jury awarded Buckley $3,388 for Seymour's breaching the noncompetition provisions of the Agreement. In addition, the trial judge submitted an interrogatory to the jury: "Is the Press*A*Dent paintless dent removal process a trade secret?" The jury answered the interrogatory in the negative. The trial court entered a judgment in accordance with the jury verdict. The trial court also granted Buckley a permanent injunction for the enforcement of the "noncompetition" provisions of the Agreement and made it effective for the period expiring two years from the date of the preliminary injunction, March 28, 1993. The permanent injunction restrained Seymour from "engaging in the business of paintless dent removal within the Alabama counties of Jefferson, Tuscaloosa, Walker, Blount, St. Clair and Shelby; and interfering with the business or contractual relationship between Mr. Buckley and his customers." Because the jury determined that Buckley's PDR process was not a trade secret, the trial court did not a issue a permanent injunction to compel Seymour to comply with the "nondisclosure" or "confidentiality" provisions of the Agreement. Pursuant to post-trial motions, the trial judge awarded Buckley attorney fees and expenses against Seymour in an amount exceeding $70,000.
Buckley appeals because, he says, he is entitled to a permanent injunction against Seymour under the "confidentiality" provisions of the Agreement or under the Indiana Uniform Trade Secrets Act, Indiana Code § 24-2-3-1 etseq. Seymour cross appeals, arguing that the public policy forbidding restraints of trade, embodied in Ala. Code 1975, §8-1-1, precludes the enforcement of the noncompetition provisions of the Agreement. Additionally, Seymour argues that the trial court acted improperly in awarding attorney fees against him and that the award should be vacated and the cause remanded for findings of fact.
 Trade Secrets
In Indiana, an employee who is entrusted with or who obtains trade secrets may make a valid covenant that prohibits him from the competitive use or disclosure of those trade secrets.Ackerman v. Kimball Int'l, Inc., 634 N.E.2d 778
(Ind.Ct.App. 1994), vacated in part, adopted in part, 652 N.E.2d 507
(Ind. 1995). See also Donahue v. Permacel Tape Corp.,234 Ind. 398, 403, 127 N.E.2d 235, 237 (1955). In cases in which employers have sought to enforce contractual provisions intended to protect trade secrets, Indiana cases have defined "trade secrets" as follows:
 " 'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.
" '. . . .
 " 'The subject of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. . . .' "
Eaton Corp. v. Appliance Valves Corp., 526 F. Supp. 1172, 1179
(N.D.Ind. 1981), aff'd by unpublished order, 688 F.2d 842 (7th Cir. 1982), quoting Restatement of Torts, § 757, comment b (1939). "The characterization of information as a trade secret will also be denied if the plaintiff fails to show that the information could not have been learned by anyone skilled in the industry involved." Eaton Corp., supra at 1179. See alsoEaton Corp., at 1179, quoting Packard Instrument Co. v.Reich, 89 Ill. App.3d 908, 45 Ill.Dec. 266, 272,412 N.E.2d 617, 623 (1980) ("Matters which are generally known in the trade *Page 224 
cannot be made secret by being so labelled in an agreement").
Even in the absence of a restrictive covenant, Indiana Law prohibits a former employee from misappropriating and using trade secrets or confidential information acquired during employment for his or a competitor's benefit in a manner that is detrimental to the former employer. Ind. Code, § 24-2-3-2. See Prudential Ins. Co. of America v. Crouch, 606 F. Supp. 464
(S.D.Ind. 1985); aff'd, 796 F.2d 477 (7th Cir. 1986); WoodwardIns., Inc. v. White, 437 N.E.2d 59 (Ind. 1982). The Indiana Uniform Trade Secrets Act, Ind. Code, § 24-2-3-2, states:
 " 'Trade Secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
 "(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
 "(2) Is the subject of some efforts that are reasonable under the circumstances to maintain its secrecy."
Under our interpretation of Indiana contract law and the Indiana Uniform Trade Secrets Act, for Buckley's process to be protected it must not be of "general knowledge in the industry" or "readily ascertainable by proper means." Because the jury determined that Buckley's PDR process was not a trade secret, our review is limited to determining whether the evidence presented at the trial supports the jury's conclusion that the process was not a trade secret. If the evidence supports that conclusion, Buckley is not entitled to a permanent injunction.
We find sufficient evidence in the record to support the jury's finding that Buckley's paintless dent removal system was not a trade secret.
At trial, James Allan Williams testified that for five years he had been operating his own paintless dent removal business, "Pro Dent," which operated principally in Dallas, Texas. He said that he was not affiliated with Buckley or Press*A*Dent and that he had learned paintless dent removal from another paintless dent removal business named "Dent Doctors." Williams stated that there were other companies and franchises that provided the same service, namely "Dent Master," whose business was located two doors down from his own, and "Dent Wizard," "Dent Man," "Contemporary," and "Hail Raisers." He testified that there were over 50 providers of paintless dent removal in the area where he worked. Williams testified that in the course of his business he had removed "hundreds of thousands" of dents and that he had worked alongside workers from other paintless dent repair companies who were "doing the same thing." Williams testified that in 1991 the paintless dent removal technique was readily ascertainable to others in the automobile body industry. Williams also demonstrated PDR in the courtroom and explained the process as he progressed.
Buckley testified that he did not invent PDR himself, but that he used the processes of two other PDR companies, Dent Masters[2] and Dent Pro. He also admitted that he did not train his craftsmen internally, but, rather, contracted with the other PDR companies to train his employees.
Greg Hudson, who had worked for Buckley from August 1991 until September 1993, testified that he was trained by "Dent Masters," the same California paintless dent removal company that had trained Seymour. He testified that trainees from other paintless dent removal companies trained along with him, despite Buckley's representation to him that Buckley had an exclusive process. Hudson also testified that the tools used in the process were much like the "body picks" he had used when doing body work in a vocational high school.
Jeff Weston, another former employee of Buckley, testified that he had been trained in Pennsylvania by an organization called "Dent Pro" and that he had also trained with persons who were not associated with Richard Buckley or Press*A*Dent. He testified that *Page 225 
in PDR he used the same tools he had used to do ordinary automobile body work and that he had removed dents without painting even before he had become affiliated with Buckley.
Terry Koebe, the executive vice president of a paintless dent removal business called "Dent Wizard," testified on behalf of Buckley. He testified that Dent Wizard was the largest paintless dent removal business in the United States and Canada. He testified that his company was four of five years old and that competition had increased to the extent that 10 to 15 other companies provided PDR service, including Press*A*Dent. Koebe testified that, because of the growth of the paintless dent removal industry, other companies marketed paintless dent removal tools and that those tools were readily available. Although Koebe stated that Dent Wizard's paintless dent removal system was a "trade secret" and a process of his company, he also stated that the concept of paintless dent removal was commonly known in the industry.
During the trial, the court also received into evidence a Ford Motor Company training manual and a training videotape depicting paintless dent removal; the videotape was entitled "Cosmetic Paint and Surface Repairs." Those materials show a 1983 copyright date. Two other training videotapes depicting paintless dent removal were also introduced into evidence.
While other testimony at the trial was to the effect that Buckley's paintless dent removal system was a trade secret, the trade secret issue was for the jury, which determined that Buckley's process was not a trade secret. That conclusion is supported by the evidence. The trial court is vested with broad discretion in ruling on a request for injunctive relief. To establish that the denial of an injunction was an abuse of the trial court's discretion, one must show that the trial court committed clear and palpable error. See Alabama Power Co. v.Drummond, 559 So.2d 158 (Ala. 1990). Given the jury's finding on the trade secret issue, we find no abuse of discretion. As to the trade secret issue, we limit our holding to the facts of this case — most important among them being that Buckley testified that he did not develop the PDR process himself; that Seymour presented evidence indicating that Buckley's PDR process did not differ from processes used by other companies providing PDR services; and that Seymour presented PDR training manuals, PDR training videotapes, and PDR tools produced by companies that were not associated with Press*A*Dent.
 The Covenant Not to Compete
On cross appeal, Seymour argues that the trial court improperly enforced the noncompetition provision of the Agreement. He argues that Alabama's public policy against restraints of trade, embodied in Ala. Code 1975, § 8-1-1, precluded the entry of any judgment enforcing the noncompetition provisions. Seymour appeals from the trial court's order granting a permanent injunction against a violation of the noncompetition clause; we conclude that this issue is moot. Seymour's noncompetition covenant was effective against him for a period of two years, measured from March 28, 1993, the date he terminated the Agreement. That period has expired. Any action by this Court now could have no effect. SeeMasonry Arts, Inc. v. Mobile County Commission, 628 So.2d 334
(Ala. 1993) ("an appeal will be dismissed as moot 'if an event happening after hearing and decree in circuit court, but before appeal is taken, or pending appeal, makes determination of the appeal unnecessary or renders it clearly impossible for the appellate court to grant effectual relief' "). See also Grossv. QMS, Inc., 669 So.2d 839 (Ala. 1995).
Seymour also appeals from the trial court's judgment awarding $3,388 for Seymour's breach of the noncompetition provisions of the Agreement. Seymour argues that the restrictive clause is void on its face, under § 8-1-1 Ala. Code, 1975, because, he says, he operated as an independent contractor and, he says, the exception to the general statutory rule against contracts of restraint applies only to "an agent, servant or employee." Section 8-1-1(b).
As stated above, the Agreement states that it is to be "governed by, construed and enforced in accordance with the *Page 226 
laws of the State of Indiana." However, the right of parties to a contract to choose the law governing their obligations is recognized by Alabama law only if the consequences of that election are not contrary to Alabama public policy. Blalock v.Perfect Subscription Co., 458 F. Supp. 123 (S.D.Ala. 1978), affirmed, 599 F.2d 743 (5th Cir. 1979); Hughes Associates, Inc.v. Printed Circuit Corp., 631 F. Supp. 851 (N.D.Ala. 1986);Cherry, Bekaert Holland v. Brown, 582 So.2d 502 (Ala. 1991).
Assuming, for the sake of argument, that Seymour was an independent contractor, we find that the noncompetition clause of the agreement was not an unlawful restraint of trade under § 8-1-1 because this Court is of the opinion that the restrictive covenant was merely a partial restraint of trade. See Gafnea v. Pasquale Food Co., 454 So.2d 1366 (Ala. 1984);Famex v. Century Ins. Services, Inc., 425 So.2d 1053
(Ala. 1982); Hughes Associates, Inc. v. Printed Circuit Corp., supra. Seymour was not prohibited from working in any other aspect of the automotive body repair business, including traditional automobile repair and reconditioning, so long as he did not perform the PDR process. In addition, we find that the covenant was reasonable and sufficiently limited. The trial court's judgment of $3,388 for Seymour's breach of the noncompetition provisions of the Agreement is affirmed.
 Attorney Fees and Expenses
Seymour argues that the trial court erred in awarding attorney fees and expenses against him in an amount exceeding $70,000 because, he says, this sum bears no relationship to the $3,388 award of damages for breach of the noncompetition provisions of the Agreement and because Buckley lost on the trade secret issue. Seymour asks this court to vacate the award and remand the cause to the trial court for findings of fact.
Following the jury trial in Buckley's favor (on the claim that Seymour had violated the noncompetition provisions), Buckley's attorneys moved for an award of expenses and attorney fees. Attached to the motion was an affidavit of Stephen Rowe, lead attorney for Buckley, which provided a summary of fees and expenses claimed. The affidavit listed the name and rate per hour of each person who had performed services in connection with the case, and a description of each service. Rowe's affidavit states that he charged Buckley $125 an hour for "partner time," between $80 and $100 an hour for "associate time," and $65 an hour for paralegal services. In the affidavit, Rowe stated that in seeking to uphold the agreement between the parties, it was necessary to obtain a temporary restraining order; to take depositions and engage in discovery; to defend an appeal of the temporary restraining order to this Court; to defend Seymour's filing of a bankruptcy petition and Seymour's claim in the bankruptcy court that the Agreement was "executory"; and to prosecute a week-long trial. At the trial court's hearing on the motion, two practicing attorneys, Mark White and Thad Long, testified in support of the motion. White testified that he had been practicing law more than 20 years; that he had served as a mediator or special master in the ascertainment of attorney fees in different types of litigation and that he had served as corporate in-house counsel responsible for determining whether claims for legal fees were reasonable. He testified that he was familiar with the fees attorneys charged in the Birmingham area for this type of litigation. White testified that he had reviewed the bills submitted to Buckley and had determined that the fee sought, $67,837.50 plus $3,700.95 in expenses, was reasonable. White testified that the services provided included, among other things, a hearing on the preliminary injunction, Seymour's appeal of the preliminary injunction to this Court, Seymour's bankruptcy proceedings, 10 depositions preceding trial, and a one-week trial. White testified that Rowe's hourly rate of $125 and the associates' rate of $80 to $100 an hour were below market rate.
Thad Long testified that he too was familiar with the fees customarily charged around Birmingham for similar legal services; he stated that the fees and expenses claimed were "very reasonable" for a case such as this one and were actually below the market rate. He stated that because of the nature of his own practice, he was familiar not only *Page 227 
with the hourly rates charged in a case like this one, but also with the cost of prosecuting an action like this one. Long testified that, in a case of this sort, where part of the relief sought is injunctive relief to prevent future damages, the amount of money damages awarded will bear no relationship to the attorney fees.
In Alabama,[3] "attorney fees are recoverable as part of the costs of an action only where authorized by statute, whenprovided in a contact, or by special equity, such as a proceeding where the efforts of an attorney create a fund out of which fees may be paid." Subway Restaurants, Inc. v. MadisonSquare Assocs., Ltd., 613 So.2d 1255 (Ala. 1993) (emphasis added.). The Agreement between Buckley and Seymour provided that "Buckley shall be entitled to recover monetary damages for any breach of this Agreement, as well as expenses of recovery, including reasonable attorneys fees."
In Peebles v. Miley, 439 So.2d 137 (Ala. 1983), we set out the following 12 factors that the trial court should consider in setting an attorney fee: (1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances. See Van Schaack v. AmSouth Bank, N.A.,530 So.2d 740 (Ala. 1988); Irons v. LeSueur, 487 So.2d 1352
(Ala. 1986); Talb, Inc. v. Dot Dot Corp., 559 So.2d 1054
(Ala. 1990); and Shirley v. Mazzone, 591 So.2d 469 (Ala. 1991). Although all of these criteria need not be applicable in a particular case, they are generally available for the trial court to consider in connection with each claim for an award of attorney fees. Graddick v. First Farmers Merchants NationalBank of Troy, 453 So.2d 1305 (Ala. 1984).
The issue of attorney fees was presented to the trial court on ore tenus evidence. Findings of a trial court based on ore tenus evidence are presumed correct, and a judgment based on such findings will not be disturbed on appeal unless they are palpably wrong, manifestly unjust, or without support from the evidence. Shearry v. Sanders, 621 So.2d 1307 (Ala. 1993). It appears from the record that the trial court on the hearing on the motion considered the 12 factors set out in Peebles and that at the hearing the trial court heard evidence concerning those factors. We see no error in the trial court's award, and we see no reason for the trial court to consider this issue further.
1941125 — ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
1941174 — ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; APPEAL DISMISSED AS TO SEYMOUR'S ARGUMENT REGARDING ENFORCEMENT OF THE INJUNCTION; OTHERWISE AFFIRMED.
MADDOX, KENNEDY, COOK, and BUTTS, JJ., concur.
[2] Also referred to as Matteson, Inc.
[3] Although the Agreement states that any dispute is to be governed by Indiana law, both parties agree that Alabama law will determine whether attorney fees are recoverable in this case. Therefore, we will not address whether attorney fees would have been recoverable under Indiana law.